**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| TEXAS VOTERS ALLIANCE, DONNIE WISENBAKER, ALAN VERA, RUSSELL HAYTER AND WARREN JOHNSON,<br><br>                              Plaintiffs,<br><br>        v.<br><br>DALLAS COUNTY, HARRIS COUNTY, HAYS COUNTY, HOPKINS COUNTY,<br><br>                              Defendants. | Case No. 4:20-cv-775 (ALM) |

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

BACKGROUND .......................................................................................................... 3

I.    Factual Background .......................................................................................... 3

    A.    CTCL's COVID-19 Response Grant Program ............................................ 3

    B.    CTCL's Grants to Defendants ................................................................... 5

    C.    This Litigation.......................................................................................... 7

II.   Legal Background ............................................................................................. 9

    A.    Elections Clause...................................................................................... 9

    B.    Help America Vote Act (HAVA) ............................................................... 9

    C.    Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"). ...................... 10

    D.    National Voter Registration Act (NVRA) ................................................... 11

ARGUMENT ............................................................................................................ 11

I.    Plaintiffs cannot establish a likelihood of success on the merits. ......................... 12

    A.    Plaintiffs lack standing............................................................................ 12

    B.    Plaintiffs lack a cause of action for their claims. ......................................... 16

        1.    The Supremacy Clause .................................................................. 16

        2.    HAVA .......................................................................................... 16

    C.    Plaintiffs are unlikely to succeed on the merits of their preemption arguments.......... 18

        1.    Elections Clause............................................................................ 19

        2.    HAVA .......................................................................................... 22

        3.    NVRA .......................................................................................... 25

        4.    Public-private partnerships ............................................................ 26

II.   Plaintiffs cannot show a likelihood of irreparable harm and the remaining equitable factors weigh heavily against granting a TRO or preliminary injunction........................................ 27

    A.    Irreparable harm..................................................................................... 27

    B.    The balance of the equities ...................................................................... 28

    C.    The public interest.................................................................................. 29

CONCLUSION........................................................................................................... 30

## INTRODUCTION

Defendants Dallas, Harris, Hays, and Hopkins Counties—like every county in Texas—must ensure the safe and efficient administration of elections during a public health crisis that has produced massive shifts in voter behavior and required new safety precautions. The last-minute overhauls of election procedures necessary to respond to these realities are costly. Defendants are 4 of 117 counties of all political persuasions across Texas that have therefore supplemented their election administration budgets with COVID-19 Response Grants from the Center for Technology and Civic Life ("CTCL"). Texas counties are expressly authorized to accept private grants "for the purpose of performing a function conferred by law on the county or a county officer." *See* TEX. LOC. GOV'T CODE § 81.032. And Texas delegates responsibility for election administration to counties. *See, e.g.*, TEX. ELEC. CODE §§ 31.043, 123.001, 32.071, 83.001, 83.002.

The organization from which Defendants accepted grants—CTCL—is a nonpartisan, nonprofit organization offering election administration grants nationwide to any and all cities or counties who choose to apply, without regard to political orientation. The purpose of these grants is to ensure that *all* voters in recipient counties can exercise the franchise safely, securely, and effectively. Early voting is already underway throughout Texas, in many jurisdictions in reliance on the expected availability of critical safety measures enabled by the grants.

Plaintiffs self-identify as partisan opponents of "progressive candidates." They challenge the legality of the CTCL grants accepted by just four counties, selectively seeking to strip away the funds upon which these counties (like so many others) are relying to ensure the integrity of electoral systems for all of their residents. Plaintiffs rest their case largely on a policy argument against the receipt of grants to fund local election administration activities. They also offer a policy objection based on the supposed targeting of these particular grants to progressive jurisdictions.

1

These arguments are meritless. As two federal judges have already determined in denying emergency relief in nearly identical lawsuits brought by the same national lawyer, neither statutory text nor constitutional precedent offers any support whatsoever for Plaintiffs' legal theories. *See* Order Denying Motion for Preliminary Relief, *Wisconsin Voters Alliance v. City of Racine et al.*, No. 20-CV-1487 (E.D. Wis. Oct. 14, 2020) (Ex. A) ("[T]he Court finds nothing in the statutes Plaintiffs cite, either directly or indirectly, that can be fairly construed as prohibiting the defendant Cities from accepting funds from CTCL. Absent such a prohibition, the Court lacks the authority to enjoin them from accepting such assistance."); Order Denying Motion for TRO and Establishing Briefing Schedule, *Election Integrity Fund v. City of Lansing & City of Flint*, No. 1:20-CV-950 (W.D. Mich. Oct. 2, 2020) (Ex. B) ("Plaintiffs' complaint and motion allege that the Cities' receipt of grants from CTCL violates the Constitution, the Help America Vote Act, 52 U.S.C. § 20901, *et seq.*, and the National Voters Registration Act, 52 U.S.C. § 20501, *et seq.* But Plaintiffs never identify language in any of those laws that explicitly prohibits cities from accepting private grants to administer elections. On the Court's review, no such explicit prohibition exists.").

Further, even as they advance claims unmoored from statutory text, Plaintiffs incorrectly assert that CTCL's grants reflect a partisan agenda. Absolutely no evidence supports this view. But that does not stop Plaintiffs from reprising it in their Complaint, their brief, or their filings. Plaintiffs' counsel, for instance, recently filed a sworn declaration implying that Plaintiffs' accusations of partisan targeting accounts for "all CTCL grant activity" reflected in "all CTCL publicly available documents." Second Declaration of Erick G. Kaardal, ECF No. 12, at ¶ 5. Just like Plaintiffs' overarching charge that CTCL targets "progressive" jurisdictions, Mr. Kaardal's declaration is erroneous. Publicly available documents on CTCL's website—which have been entered into the record in multiple other pending cases where Mr. Kaardal is counsel—make clear

that CTCL has provided grants to literally hundreds of other jurisdictions that Mr. Kaardal did not list. Those documents firmly contradict any innuendo of partisan targeting. Indeed, within the State of Texas alone, 80% of CTCL grants happen to have gone to counties with strong conservative voting records. Thus, even accepting Plaintiffs' legal theories (which other courts have rejected), the premise underlying their policy arguments collapses when subjected to minimal scrutiny.

In all events, Plaintiffs' motion for a temporary restraining order should be denied on many additional grounds. Plaintiffs lack Article III standing, lack a cause of action, and fail to identify a single statute or constitutional provision that supports their argument. As if that were not enough, Plaintiffs have failed to identify a substantial risk of irreparable harm. And the remaining equitable factors uniformly favor Defendants. It would be disruptive and inconsistent with precedent for the Court to disrupt election administration—by abruptly blocking the use of allocated funds—mere weeks before Election Day, while voting is already underway. Whereas Plaintiffs offer scant evidence to support their varied accusations and insinuations, the points just described are each thoroughly supported by the declarations attached hereto. Plaintiffs' motion should be denied.

## BACKGROUND

## I.   Factual Background

### A.   CTCL's COVID-19 Response Grant Program

The Center for Tech and Civic Life ("CTCL") is nonpartisan non-profit organization with a mission to promote civic engagement and modernization of election administration procedures.[1] Since its founding in 2012, it has offered trainings and other logistical support to local election officials throughout the country—and particularly in smaller jurisdictions with limited personnel and budgets—to enable them to more effectively serve voters in their communities. It has also

---

[1] The facts set forth in this section are based on CTCL's publicly accessible website. *See* Ex. C.

disseminated data to make elections and election processes more transparent. CTCL's leadership is bipartisan and its Board of Directors and Advisory Committee consist primarily of individuals who have dedicated their careers to nonpartisan election administration.

In 2020, CTCL recognized that election administrators nationwide faced unprecedented challenges in adapting to the pandemic. In response, CTCL created a COVID-19 Response Grant Program.  This charitable grant program offers funding to local officials to help them adopt safe and efficient voting procedures during the COVID-19 global pandemic. Compl., Exs. A, B. CTCL's grants can be used by election administrators for a range of nonpartisan purposes, which include covering expenses associated with: (1) ensuring safe and efficient operation of polling places on Election Day, such as stocking sufficient PPE, (2) recruiting, training, and retaining poll workers (to fill vacancies left by wary seniors), and providing them with hazard pay, (3) meeting spikes in demand for mail voting and other socially distant voting alternatives, and (4) timely informing voters about voting opportunities and changes to voting procedures. Compl., Ex. A at 4-5. Localities decide how the funds are to be spent within broad parameters. *See id.* at 4-5, 7-8.

CTCL's grants are available on a nondiscriminatory basis to any local election office that chooses to apply—rural, urban, or suburban; historically red, blue, or purple—anywhere in the country. *See* CTCL Statement on the Amistad Project, Ex. D. CTCL guarantees every applicant (even the most sparsely populated jurisdictions) a minimum of $5,000 and has publicly committed to approving every eligible election department that applies, subject only to verification that the applicant is legitimate. *See id.* Accordingly, applicants are asked only for basic information such as the number of registered voters and their existing budgets; no partisan criteria are requested or even communicated to CTCL—much less considered in awarding grants. Compl., Ex. A at 5-6.

A diverse group of over 1,100 local government entities from around the country have taken CTCL up on its offer. *See* Ex. D. That includes nearly half of all counties in Texas: As of October 15, 2020, a total of 117 counties from all over the Lone Star State had requested funds. *See id.*[2] While Plaintiffs offer no actual evidence of partisan targeting or impropriety—and while there is no evidence that partisan considerations played any role in CTCL's grant program—it bears mention that 88% of the 117 grant recipients in Texas voted for the Republican Presidential candidate in the 2016 election, many by wide margins. *See* Ex. E (a list of every county that has received a grant, broken down by votes in the 2016 election). The following figure shows which counties accepted grants, color-coded by the winner of the county in 2016 and the margin:



### B.    CTCL's Grants to Defendants

Defendants are four of the 117 counties in Texas that received grants. Each of them faces the same extraordinary challenges as other counties throughout Texas. On July 27, Governor

---

[2] Grayson County is one of the counties where voters will benefit from these much-needed funds. *See* Ex. D.

Abbott issued a disaster declaration that expanded early voting in all Texas counties and emphasized the pressing need for local election officials to implement social distancing and safe hygiene practices. As the fall election grew nearer, signs were legion that Defendants needed to rapidly prepare for radically different voting patterns and challenges than they had ever faced. *See* Ex. F at ¶¶ 5, 7-11 (Declaration of Christopher G. Hollins, Harris County Clerk); Ex. G at ¶¶ 4, 6-8 (Declaration of Tracy Smith, Hopkins County Clerk); Ex. H at ¶¶ 7-8 (Declaration of Jennifer Anderson, Election Administration for Hays County, Texas); Ex. I at ¶¶ 6-9 (Declaration of Antoinette "Toni" Pippine-Poole, Elections Administration of Dallas County, Texas). It was also clear that existing funding sources were inadequate to fully address those pressing needs. *See* Ex. F at ¶¶ 6, 12-15; Ex. G at ¶¶ 9-11; Ex. H at ¶¶ 6-10; Ex. I at ¶ 10.

Around this time, Defendants learned of the CTCL grant program. Each of the Defendants applied and was granted funds. *See* Ex. F at ¶¶ 15-16; Ex. G at ¶¶ 12-14; Ex. H at ¶¶ 3-4; Ex. I at ¶¶ 11-13. No part of this application process involved partisan criteria or information. *See* Ex. F at ¶ 18; Ex. G at ¶ 15; Ex. H at ¶ 4; Ex. I at ¶¶ 11-14. The Dallas County Commissioner's Court authorized accepting a $15,130,433 grant on September 15, 2020—and then, on October 6, 2020, again formally approved accepting the grant. *See* Ex. J at ¶¶ 3-6 (Declaration of Ronica Watkins, Budget Officer in the Dallas County Office of Budget and Evaluation). The Hopkins County Commissioner's Court authorized accepting a $19,952 grant on September 28, 2020. *See* Ex. G at ¶ 14. The Harris County Commissioner's Court authorized accepting a $9.6 million grant on September 29, 2020. *See* Ex. F at ¶ 16. Finally, the Hays County Commissioner's Court (consisting of three elected Republican officials and two elected Democratic officials) voted unanimously to authorize accepting a $289,075 grant on September 29, 2020. *See* Ex. H at ¶¶ 5-6.

Defendants have put these funds to use on a nonpartisan basis to meet voting needs for all residents. In Harris County, the grant allowed an expansion of drive-through and early voting locations, making "election services *more* available and more evenly available across Harris County." Ex. F at ¶ 18. In Hopkins County, it has helped to cover the hiring of new staff, new voting signage, and PPE necessary to hold a safe election. *See* Ex. G at ¶ 5. In Hays County, the funds are allocated to hiring additional staff, purchasing CDC-compliant PPE, distributing election outreach materials, and covering expenses related to anticipated change sin voter queuing and/or increasing in ballot-by-mail voting. *See* Ex. H at ¶ 10. And in Dallas County, the funds are being used and allocated to operate early-voting locations during the early voting period, to process and count mail ballots, to operate polling places on Election Day, to pay poll workers, to purchase PPE, and to provide for enhanced sanitation and cleaning at poll places. *See* Ex. I at ¶ 14.

Since receiving the funds, Defendants have already spent or irrevocably committed a large fraction of them. *See* Ex. F at ¶ 20 ("The election has already started. The budget for conducting the election was expanded and build around the receipt of the CTCL grant. The $9,663,445 represents approximately *one-third* of our overall budget for conducting this high-turn out general presidential year election for our 2.4 million registered voters."); *see also id.* at ¶ 21; Ex. G at ¶ 17-18; Ex. H at ¶ 10; Ex. I at ¶¶ 12, 16. Accordingly, as officials from each jurisdiction explain, suspending use of the grant moneys at this late stage would throw early voting—which began on Tuesday October 13, 2020—into disarray, inflict concrete harm on local election systems, and risk voter confusion. *See* Ex. F at ¶ 22; Ex. G at ¶¶ 17-18; Ex. H at ¶ 11; Ex. I at ¶¶ 16-17

## C.    This Litigation

On October 9, 2020, this lawsuit was filed by an advocacy organization calling itself the Texas Voters Alliance (alleged to be an unincorporated membership association, with no members

identified), as well as four individuals whose counties of residence are not specified. Compl. ¶¶ 4-8. Each individual plaintiff allegedly "opposes the election of progressive candidates in local, state, and federal elections." *Id.* ¶¶ 5-8. Plaintiffs contend that Defendants' use of supplemental funding for local election administration from private grants is illegal. They argue that the grants violate a legal prohibition that is atextual but lurks somewhere in the penumbras of the Elections Clause, the Supremacy Clause, the U.S. Constitution generally, two federal election-modernization statutes, or some combination of all of the foregoing. Compl. ¶¶ 99-173.

Plaintiffs also assert—without evidence (indeed, despite the evidence)—that the CTCL grants have been targeted at jurisdictions with histories of supporting "progressive" candidates. *See* Compl., Ex. A. That same argument has been advanced in seven nearly identical lawsuits filed around the country, all of which seek the same emergency relief that Plaintiffs seek here and all of which appear to involve the same national counsel. *See Minnesota Voters Alliance, et al. v. City of Minneapolis*, No. 20-cv-2049 (D. Minn. Sept. 24, 2020); *Wisconsin Voters Alliance, et al. v. City of Racine, et al.*, No. 20-cv-1487 (E.D. Wis. Sept. 24, 2020); *Pennsylvania Voters Alliance, et al. v. Centre County, et al.*, No. 4:20-cv-1761 (M.D. Pa. Sept. 25, 2020); *Election Integrity Fund, et al. v. City of Lansing, et al.*, No. 20-cv-950 (W.D. Mich. Sept. 29, 2020); *Iowa Voter Alliance, et al. v. Black Hawk County, et al.*, No. 6:20-cv-2078 (N.D. Iowa Oct. 1, 2020); *Georgia Voter Alliance, et al. v. Fulton County*, No. 1:20-cv-4198 (N.D. Ga. Oct. 9, 2020). In each of these cases, the plaintiffs have raised a similar theory of progressive targeting. And in many of these cases, the defendant counties have submitted evidence from CTCL's public website about grant recipients in their own states—pointing out that the plaintiffs offered an incomplete picture and that the full list of recipients confounds accusations of partisan targeting. The same is true here. Plaintiffs purport to present a list of counties that received grants from CTCL. *See* Compl. ¶ 69; *see* TRO 5

(referring, without any basis or explanation, to "CTCL's top 18 grants"). But that list is decidedly incomplete, excluding the vast majority of jurisdictions in Texas that received money, as well as many jurisdictions in many other states. To date, the only two federal courts to have ruled on these issues have decisively rejected Plaintiffs' theories. *See* Ex. A (Wisconsin); Ex. B. (Michigan).

## II.     Legal Background

### A.     Elections Clause

The Elections Clause of the U.S. Constitution provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. 1, § 4, cl. 1. Simply stated, the Elections Clause requires the states to prescribe the "time, place, and manner" of holding congressional elections, but allows Congress to preempt those choices. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8 (2013).

### B.     Help America Vote Act (HAVA)

Congress passed the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901 *et seq.*, "to improve the electoral system in the United States following the November 2000 election." *Story v. Hargett*, No. 15 Civ. 2540, 2016 WL 519133, at *2 (W.D. Tenn. Jan. 12, 2016). To that end, HAVA created new mandatory minimum standards for state election administration. It also provided states with funding to meet those standards, to replace their voting systems, and to make overall improvements to election administration. The major substantive mandates of HAVA are contained in Title III, which imposes requirements on states concerning voting equipment, registration databases, provisional voting, and voter identification. *See* 52 U.S.C. §§ 21801-21102.

In addition, HAVA established the Election Assistance Commission (EAC) to assist the states in complying with HAVA and to distribute HAVA funds to them.[3]  HAVA requires each state to develop a plan for compliance with HAVA's substantive requirements in order to receive funding from EAC, *id.* § 21003.[4]

Finally, HAVA also establishes two forms of potential remedies if its requirements are not met: (1) the U.S. Department of Justice can seek declaratory or injunctive relief to carry out the requirements in Title III; and (2) the states must establish administrative complaint procedures by which a complainant can seek to remediate Title III violations. *See id.* §§ 21111-21112.

### C.      Coronavirus Aid, Relief, and Economic Security Act ("CARES Act").

The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020), was signed into law on March 27, 2020, "in response to the extraordinary public health and economic crisis caused by the COVID-19 pandemic." *Oakley v. Devos*, No. 20-CV-03215, 2020 WL 3268661, at *2 (N.D. Cal. June 17, 2020). Among many other things, the CARES Act appropriated $400,000,000 in "Election Security Grants" to "prevent, prepare for, and respond to coronavirus . . . for the 2020 Federal election cycle." 134 Stat. at 530. CARES Act funds were provided to states, which are required to make a "full accounting" of their "uses of the payments to the EAC after each election in the State during the 2020 cycle. *Id.* at 531. The States are also required to return to the Treasury Department any funds that remain "unobligated as of December 31, 2020." *Id.* There is no language in the CARES Act requiring these monies to be used before other funds are appropriated or prohibiting other sources of funding.

---

[3]    *See    Help    America    Vote    Act*,    U.S.    ELECTION    ASSISTANCE    COMM'N, https://www.eac.gov/about_the_eac/help_america_vote_act.aspx (last visited Oct 14. 2020, 7:02 PM).

[4] States may decline to receive federal funds under HAVA, but then they must file a compliance plan with the Department of Justice. *See* 52 U.S.C. § 21112(b).

10

### D.    National Voter Registration Act (NVRA)

The National Voter Registration Act (NVRA) "regulates voter registration." *Gonzalez v. Arizona*, 677 F.3d 383, 402 (9th Cir. 2012). In particular, the NVRA "requires States to provide simplified systems for registering to vote in federal elections," including voter registration by mail, at various state offices, and on a driver's license application. *Young v. Fordice*, 520 U.S. 273, 275-76 (1997) (emphasis omitted); *see* 52 U.S.C. §§ 20503-20508. "The NVRA specifies various details about how these systems must work, including, for example, the type of information that States can require on a voter registration form." *Young*, 520 U.S. at 276; *see* 52 U.S.C. § 20508.

## ARGUMENT

A plaintiff seeking a temporary restraining order or preliminary injunctive relief must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat that plaintiff will suffer irreparable harm if the injunction is not granted; (3) the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) the injunction will not disserve the public interest. *CoreClarity, Inc. v. Gallup, Inc.*, No. 4:20-CV-601, 2020 WL 5095130, at *2 (E.D. Tex. Aug. 28, 2020). A temporary restraining order is "an extraordinary and drastic remedy, not to be granted routinely, but rather to be granted only if the plaintiff clearly carries the burden of persuasion as to *all four factors.*" *Id.* (emphasis in original). Here, Plaintiffs fail to satisfy any of the four factors. This Court should deny their motion for extraordinary relief.

## I.      Plaintiffs cannot establish a likelihood of success on the merits.

Plaintiffs are unlikely to succeed on the merits for three reasons. First, they are unlikely to demonstrate standing. Second, they are unlikely to show that they have a cause of action for their claims. And finally, they are unlikely to succeed on the merits of any of their claims.

### A.      Plaintiffs lack standing.

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). To seek emergency injunctive relief on any of their claims, Plaintiffs must "make a clear showing" that at least one of them has Article III standing. *See Barber v. Bryant,* 860 F.3d 345, 352 (5th Cir. 2017); *Hale v. Collier*, No. 1:20-CV-841, 2020 WL 5249532, at *4 (W.D. Tex. Sept. 3, 2020). This requires Plaintiffs to establish (1) a concrete and particularized injury-in-fact, (2) a causal connection between that injury and the challenged conduct, and (3) redressability. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014). TVA, an organizational plaintiff, must further demonstrate either that it has standing "in its own right" because the organization itself has suffered a legally sufficient harm, or "as the representative of its members." *Warth v. Seldin*, 422 U.S. 490, 511 (1975); *see Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010).

TVA has not carried its burden to establish standing. TVA has not alleged or otherwise identified *any* of its members, much less explained why its members would have standing. *See* Compl. ¶ 4 (alleging that the TVA only "has many members"). None of the individual plaintiffs are alleged to be members of the TVA. And TVA has asserted no harm to its own organizational interests, much less one that is "more than a setback to the organization's abstract societal interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982).

The individual defendants fare no better. Plaintiffs' theories of standing suffer from fatal deficiencies that compel denial of Plaintiffs' requested relief and the dismissal of this action.

*First*, plaintiffs have not provided any of the evidence needed to evaluate their standing. Pleadings alone are insufficient to establish standing when seeking injunctive relief. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Kumar*, 2020 WL 4464502, at *5. Yet Plaintiffs have submitted no evidence to establish the allegations in their Complaint. To the extent Plaintiffs imply that merely alleging the violation of a federal statute confers standing on them, that contention is foreclosed by *Spokeo, Inc. v. Robins*, which held that "Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." 136 S. Ct. 1540, 1547-48 (2016) (citation omitted). The Court can deny the requested temporary restraining order on this ground alone. *See Hale*, 2020 WL 5249532, at *4.

*Second*, even taking Plaintiffs' unsworn standing arguments at face value, they have failed to assert any cognizable injury-in-fact. Plaintiffs contend that they are harmed because Defendants' acceptance of private grants "unconstitutionally influence[s] electoral outcomes" by promoting voting in jurisdictions that have historically supported candidates Plaintiffs do not favor. TRO Mot. at 11. But that "abstract interest" in the outcome of an election is a classic "'undifferentiated, generalized grievance'" and is "common to all members of the public"; it is therefore not "an individual and personal injury of the kind required for Article III standing." *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018). Plaintiffs are not injured when other citizens choose to vote, nor are they are injured by actions that make safe and efficient voting more readily available to all residents of the Counties (even if Plaintiffs believe that their preferred candidates will not garner as much support if other citizens cast their ballots more securely). As the Fifth Circuit recently stated, "a law that makes it easier for others to vote does not abridge any person's right to vote. How this

13

expansion of voting opportunities burdens anyone's right to vote is a mystery." *Texas League of United Latin Am. Citizens v. Hughs*, No. 20-50867, slip op. 11 (5th Cir. Oct. 12, 2020).

At bottom, this case is squarely controlled by *Gill*, another case where plaintiffs alleged a statewide imbalance in election procedures but failed to offer any evidence that they had a personal stake in the outcome apart from their interest "in influencing the legislature's overall 'composition and policymaking.'" *Gill*, 138 S. Ct. at 1931. That is true regardless of whether Plaintiffs even live in the Defendant Counties. If anything, Plaintiffs might personally be *better off* as a result of these grants, which fund improvements to election administration in counties through Texas (perhaps including their own). Frustration of Plaintiffs' policy preference for others to be denied safe and secure voting opportunities is not an Article III injury. *See Vaughan v. Lewisville Indep. Sch. Dist.*, No. 4:19-CV-109, 2020 WL 4431926, at *5 (E.D. Tex. July 31, 2020) ("At most, Vaughan has shown that he experienced disappointing electoral outcomes, which is not an enforceable interest.").

*Third*, even if Plaintiffs have identified a cognizable harm, they have not met the additional requirement to show that any such harm is "'actual or imminent, not conjectural or hypothetical,'" as Supreme Court precedent requires. *Susan B. Anthony List*, 573 U.S. at 158 (quoting *Lujan*, 504 U.S. at 560 (Scalia, J.)); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013) (Alito, J.). As an initial matter, Plaintiffs' theory of injury rests on the erroneous factual premise— addressed above—that CTCL's grants are aimed at progressive jurisdictions and may somehow skew election results. Because that premise is unsupported by any evidence—and is contracted by the evidence attached to this filing—Plaintiffs' purported Article III injury is unlikely to occur.

Moreover, Plaintiffs' theory of standing is not only factually unsupported, it is also legally deficient because Plaintiffs' alleged harm is neither actual nor imminent.  Instead, Plaintiffs' theory

14

Case 4:20-cv-00775-ALM   Document 19   Filed 10/15/20   Page 17 of 34 PageID #:  349

of harm relies on an extended chain of speculative and uncorroborated inferences about how the Counties' receipt of these funds might affect the behavior of third parties, including election administrators and voters throughout the state. In turn, Plaintiffs reason, those third-party decisions might impact election results down the line in the aggregate by some way, somehow causing some voters to cast valid ballots they might not have otherwise cast for a candidate Plaintiffs do not support that might in turn cause that candidate to lose. A harm that depends on a chain of contingencies is the paradigmatic "conjectural or hypothetical injury." *See Clapper*, 568 U.S. at 410 (no standing where plaintiffs relied on "a highly attenuated chain of possibilities").[5]

Plaintiffs strain to avoid this conclusion by describing an imaginary Article III doctrine in which the Constitution is not just a "social contract," but instead an *actual* enforceable contract. On this theory, all American citizens are "third-party beneficiaries" of the Constitution (or at least certain parts of it) and any citizen can sue for "tortious interference with a contract" any time he believes that the Constitution has been violated. TRO Mot. at 11-12. Obviously, this is not the law. *See Susan B. Anthony*, 573 U.S. at 158, *Clapper*, 568 U.S. at 401; *Lujan*, 504 U.S. at 560. And it is telling that Plaintiffs resort to such fanciful arguments in support of their standing: this confirms that they cannot meet Article III's requirements as actually stated by the Supreme Court.

For all the reasons just discussed, plaintiffs have neither pleaded nor proved the concrete and particularized injury that Article III requires—and so their motion should be denied.

---

[5] The absence of imminence is especially apparent in Plaintiffs conjecture that increased "progressive" voter turnout may not only cost their preferred candidates one or more elections, but also will somehow deprive Plaintiffs of "representation in Congress, as opposed to other states who will still be represented in Congress." TRO Mot. at 11. Plaintiffs offer no explanation for how an electoral loss by their preferred candidates, or any other electoral outcome, could conceivably translate into a loss of representation for Texas voters vis-à-vis other states represented in Congress. If they mean to suggest that Congress might refuse to seat Texas's House delegation because Defendants accepted and used the grants, that unfounded speculation shows how far down the chain of fanciful inferences Plaintiffs must travel in search of a theory of Article III injury.

**B.      Plaintiffs lack a cause of action for their claims.**

Plaintiffs allege that CTCL's grants are unlawful under the Supremacy Clause, the Elections Clause, HAVA, and the NVRA. TRO Mot. at 2. However, Plaintiffs lack a cause of action and therefore are not likely to succeed on the merits of any of their claims. *See, e.g.*, *Murungi v. Texas Guaranteed*, No. 09-CV-3109, 2009 WL 1458171, at *1 (E.D. La. May 22, 2009) ("Murungi cannot show a likelihood of success because the Higher Education Act does not create a private right for borrowers to sue lenders or guaranty agencies.").

**1.      The Supremacy Clause**

Plaintiffs contend that the Supremacy Clause of the Constitution endows them with a private cause of action. *See* TRO Mot. 8-9 (citing *League of Women Voters v. Blackwell*, 340 F.Supp.2d 823 (N.D. Ohio 2004)). But as Supreme Court unanimously held in *Armstrong v. Exceptional Child Center., Inc.*, "the Supremacy Clause is not the source of any federal rights, and certainly does not create a cause of action." 575 U.S. 320, 324-25 (2015) (Scalia, J.). Thus, Plaintiffs are not likely to succeed based on this nonexistent cause of action.[6]

**2.      HAVA**

Nor can Plaintiffs establish a likelihood of success in showing that HAVA provides them with a private cause of action. *See* TRO Mot. at 9-10. In *Brunner v. Ohio Republican Party*, the Supreme Court reversed a TRO granted to remedy a HAVA violation because, "regardless of whether HAVA [was] being properly implemented," the private plaintiffs were "not sufficiently likely to prevail on the question whether Congress has authorized [a federal court] to enforce [the relevant HAVA provision] in an action brought by a private litigant." 555 U.S. 5, 6 (2008) (per

---

[6] Although Plaintiffs assert that CTCL's grants are also preempted by the Elections Clause, TRO Mot. 15-20, they do not argue that the Elections Clause provides a cause of action for their claims, as they instead rely on their (incorrect) assertion that the Supremacy Clause does so.

curiam). *Brunner*'s holding regarding HAVA followed inevitably from *Alexander v. Sandoval* (which it cited), where the Supreme Court explained that "private rights of action to enforce federal law must be created by Congress," and "statutory intent on this . . . point is determinative." 532 U.S. 275, 286 (2001) (Scalia, J.). As Sandoval explained, a private cause of action does not exist unless a statute displays a clear congressional intent to create a private right and remedy—and to determine whether Congress intended to create a private right and remedy under a federal statute, the statutory "text and structure" are key. *Id.* at 288. Where a statute makes "express provision [for] one method of enforcing a substantive rule," it signals to courts that "Congress intended to preclude other[]" methods, including implied private rights of action. *Id.* at 290.

Applying *Sandoval*'s instructions, at least three circuits have squarely held that "HAVA creates no private cause of action." *Bellitto v. Snipes*, 935 F.3d 1192, 1202 (11th Cir. 2019); *see also Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 572 (6th Cir. 2004) (HAVA "does not itself create a private right of action."); *Am. Civil Rights Union v. Philadelphia City Commissioners*, 872 F.3d 175, 181 (3d Cir. 2017) ("HAVA does not include a private right of action that allows aggrieved parties to sue nonconforming states."). Their logic should govern here.

Plaintiffs attempt to escape *Brunner*, *Sandoval*, *Bellitto*, *Sandusky*, and *ACRU* by citing one of HAVA's remedy provisions, 52 U.S.C. § 21112. TRO Mot. at 9-10. Under that provision, states receiving HAVA funds must provide an "appropriate remedy" to "any person who believes that there is a violation of any provision of subchapter III (including a violation which has occurred, is occurring, or is about to occur)." TRO Mot. at 9 (quoting 52 U.S.C. § 21112). Plaintiffs then claim that Texas' complaint process is "legally insufficient" to satisfy its obligations under § 21112. But even if this were true (and Plaintiffs offer no reason to think so), it would not suffice to create a private right of action under HAVA.

*First*, Plaintiffs' approach inverts *Sandoval*'s instructions: a provision expressly identifying state administrative remedies as an enforcement method cannot somehow impliedly create a private right of action where that process is allegedly deficient; instead, the presence of that remedy provision is evidence Congress aimed to *preclude* a private right of action. *Second*, Plaintiffs also disregard another independent means of enforcing HAVA, expressly provided for in the statute—namely, a civil action brought by the Attorney General—which likewise strongly counsels against inferring a private right of action. *See Bellitto*, 935 F.3d at 1202 (citing 52 U.S.C. §§ 21111, 21112); *see also Sandoval*, 532 U.S. at 290 (express statutory regime for enforcement by federal agencies precludes existence of private right of action).

Accordingly, Plaintiffs are unlikely to succeed on showing a cause of action under HAVA.[7]

**C.      Plaintiffs are unlikely to succeed on the merits of their preemption arguments.**

Even if Plaintiffs can show that they have Article III standing and a right to bring this action, they are not entitled to a TRO because they cannot show a likelihood of success on the merits of any of their preemption claims. Two federal judges have already denied emergency relief on this basis in virtually identical lawsuits. *See* Exs. A & B.

Plaintiffs assert that Defendants cannot lawfully accept private grant funds for election administration because those grants are "preempted under federal and state law." TRO Mot. at 15. But Plaintiffs discuss only two sources of federal law: the Elections Clause and HAVA. TRO Mot. at 15-21. Neither gives rise to federal preemption.

---

[7] Plaintiffs assert in just a single sentence that the NVRA preempts CTCL's grants, TRO Mot. at 2, and they do not actually claim to have a cause of action under the NVRA. Even if they did assert a cause of action under the NVRA, they failed to satisfy a key statutory prerequisite: the NVRA requires that a person be "aggrieved" by a violation of the statute in order to pursue a private right of action in federal district court. 52 U.S.C. § 20510. For the same reasons they failed to show Article III standing, Plaintiffs are not "aggrieved" under the NVRA.

Federal preemption can take one of three forms: express, field, or conflict. *See, e.g.*, *Friberg v. Kansas City S. Ry. Co.*, 267 F.3d 439, 442 (5th Cir. 2001). Plaintiffs do not argue that the Election Clause or HAVA contains an express statement of preemption. Nor do they argue field preemption, which requires a "clear and manifest purpose of Congress to preclude even complementary state legislation on the same subject." *City of El Cenizo, Texas v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018); *see also* HAVA, 52 U.S.C. § 21003(c) (leaving specific choices on methods of complying with the elements of a State [HAVA] plan . . . to the discretion of the State"). Thus, the only type of preemption that could conceivably apply here is conflict preemption. But "conflict preemption" occurs only where (a) "compliance with both federal and state regulations is a physical impossibility" or (b) where the "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995). And here, no federal law conflicts with Defendants' action. There is thus no preemption.

### 1. Elections Clause

Plaintiffs' claim that the Elections Clause preempts receipt of CTCL's federal election grants is unlikely to succeed. The plain constitutional text of the Elections Clause makes clear that it is not implicated by the grants at issue. Nothing in the Clause constrains localities' decisions about how to pay for administrative responsibilities that a state has assigned to them.

The Elections Clause empowers states to prescribe the "Times, Places and Manner of holding Elections for Senators and Representatives" and allows Congress "at any time by law [to] make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. As the plain text shows, the Elections Clause describes the balance of authority between states and Congress when regulating federal elections. *See Inter Tribal Council*, 570 U.S. at 8; *see also Voting Integrity Project, Inc. v. Bomer*,

199 F.3d 773, 775 (5th Cir. 2000). The text of the Clause says nothing about local government and nothing about how political subdivisions within states may fund elections.

Plaintiffs take this silence to mean that the Counties "have no power to have federal election policies." TRO Mot. at 15-17. Remarkably, they cite no authority whatsoever for that proposition and do not even attempt to explain what they mean by it. If Plaintiffs are suggesting that local governments cannot participate in administering federal elections, they are obviously wrong—many states (including Texas) have long enlisted county governments in election administration. *See, e.g.,* TEX. ELEC. CODE §§ 31.043, 32.071, 83.001, 83.002, 123.001. As a recent CRS report explained: "States typically have primary responsibility for making decisions about the rules of elections (policymaking). Localities typically have primary responsibility for conducting elections in accordance with those rules (implementation). Localities, with varying contributions from states, typically also have primary responsibility for paying for the activities and resources required to conduct elections (funding)." CRS, *The State and Local Role in Election Administration: Duties and Structures* 1 (2019). Plaintiffs' unsupported theory would render nearly all election administration statutes throughout Texas and elsewhere unconstitutional.

Perhaps Plaintiffs instead seek to rely on the Election Clause's delegation to the States of power to prescribe the "Times, Places and Manner" of federal elections. If that is their theory, they misread the Constitution. The phrase "Time, Place, and Manner"—given its plain, ordinary meaning—has nothing to do with how the Counties pay their bills. *See Cook v. Gralike*, 531 U.S. 510, 523-24 (2001) (observing that regulation of the "Manner" of federal elections "encompasses matters like 'notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns'"). Plaintiffs are not challenging any discrete decision any county

has made about *how* to administer the election, only their decisions about how to pay for it. There is no precedent at all for making this local decision a matter of federal constitutional concern.

Plaintiffs next argue that neither states nor local governments can "dictate federal election outcomes," "favor or disfavor candidates," or "favor a demographic group" under the Elections Clause. TRO Mot. at 17-18. That argument is doubly inapplicable to this case. *First*, as explained above, all available evidence contradicts Plaintiffs' assertion that CTCL's grants have somehow been targeted in a partisan way. *Second*, and more fundamentally, Plaintiffs misunderstand the role of the Elections Clause. It is not a freestanding guarantee to individuals against "unfair" elections, functioning like some sort of standardless, supercharged Equal Protection Clause. "The dominant purpose of the Elections Clause, the historical record bears out, was to empower Congress to override state election rules." *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 814-15 (2015). It is therefore not surprising that Plaintiffs identify no case in which a local government's choice of funding (or any other local decision remotely analogous to that at issue here) was invalidated under the Elections Clause itself.[8] Indeed, in the area of funding, Congress relies on States—and, in practice, localities—to administer and fund the federal election.

In sum, the Elections Clause deals with the distribution of responsibilities between the federal and state governments. Unless Congress says otherwise, it does not prohibit the states from delegating responsibilities relating to election administration to political subdivisions like the Defendants (as virtually all states routinely do). Because the Elections Clause permits, rather than

---

[8] The cases that Plaintiffs cite in their motion are wholly inapposite. *U.S. Term Limits, Inc. v. Thornton* invalidated a state constitutional amendment imposing term limits on congressional candidates that conflicted with the Constitution's qualifications for members of Congress. 514 U.S. 779, 835-36 (1995). *The Ku Klux Cases* upheld a federal criminal statute prohibiting interference with voting under the Fifteenth Amendment. 110 U.S. 651, 664 (1884). Neither case involved any local election administration decision, much less suggested that such a decision was somehow unconstitutional despite not conflicting with any other provision of federal or state law.

21

prohibits, local government administration of elections, including funding decisions, there is no conflict with the Elections Clause here.

### 2.    HAVA

Plaintiffs are also unlikely to succeed in arguing that Defendants' receipt of CTCL grants is preempted by HAVA. The Counties' decision to accept these funds does not render HAVA compliance impossible, nor does it pose "an obstacle to the accomplishment and execution of the full purposes and objectives" of HAVA. *See Freightliner Corp.*, 514 U.S. at 287.

*First*, there is no provision in HAVA that explicitly or impliedly makes acceptance of private grant money an "impossibility." *City of Morgan City v. S. Louisiana Elec. Co-op. Ass'n*, 31 F.3d 319, 322 (5th Cir. 1994). To the contrary, HAVA explicitly contemplates that states will receive funds from non-HAVA sources: the Act requires state recipients of HAVA funds to keep records "which fully disclose the amount and disposition . . . of funds, the total cost of the project or undertaking for which such funds are used, and the amount of that portion of the cost of the project or undertaking *supplied by other sources*." 52 § U.S.C. 21142(a) (emphasis added). That is unsurprising: HAVA did not federalize all election-related funding decisions. There is thus no conflict with Defendants' decision to seek election administration funds elsewhere, and no limit on using additional sources of funding, especially where expressly permitted by state law. *See* TEX. LOC. GOV'T CODE § 81.032 (authorizing acceptance of private grants to fund county functions).

*Second*, Defendants' receipt of election administration grants does not stand as an obstacle to the accomplishment of HAVA's purposes. HAVA is principally "concerned with updating election technologies and other election-day issues at polling places." *Democratic Nat'l Committee v. Republic Nat'l Committee*, 673 F.3d 192, 211 (3d Cir. 2012); *accord Gonzalez v. Arizona*, 677 F.3d 383, 402 (9th Cir. 2012). Defendants here obtained grants geared towards "ensuring [local election jurisdictions] have the staffing, training, and equipment necessary so this November every

22

eligible voter can participate in a safe and timely way and have their vote counted." Compl. ¶ 52. Such grants do not impede HAVA's aim to promote smoother-functioning elections. To the contrary, Defendants' receipt of CTCL grants actively *promotes* the purposes of the statute.

Plaintiffs therefore have not met their burden to establish a likelihood that HAVA conflicts with accepting the grants. Each purported "conflict" that Plaintiffs identify in their Complaint lacks merit, Compl. ¶¶ 26-29, and Plaintiffs omit all but one of those purported conflicts from their brief, *see* TRO Mot. at 20-21. There, they cite only HAVA's provision for election payments to states, 52 U.S.C. 20901, asserting that this provision confers "no legal authority . . . for counties and cities, which are political subdivisions of the States, to accept and use private federal election grants." TRO Mot. at 21. But so what? The absence of express federal statutory authorization for Defendants' action in HAVA does not trigger conflict preemption, which instead requires federal law to affirmatively conflict with and thereby prohibit Defendants' action. In fact, *Florida State Conference of N.A.A.C.P. v. Browning* rejected an analytically indistinguishable argument from "negative implication," holding that Florida's "matching" verification requirement for voter registration was not preempted by HAVA's provision on state voter registration databases. 522 F.3d 1153, 1168 (11th Cir. 2008). As *Browning* explained, the fact that HAVA did not "prescribe matching as a federal precondition for voter registration" did not mean that HAVA somehow implicitly "*prohibit[s]* states from implementing [matching]." *Id.* (emphasis added).

*Browning* reflects the common-sense principle that there is no conflict preemption under HAVA unless the defendant is engaged in "conduct that the federal Act *forbids*." *Michigan Canners & Freezers Ass'n, Inc. v. Agric. Mkt. & Bargaining Bd.*, 467 U.S. 461, 478 (1984) (emphasis added); *see also Am. Civil Rights Union v. Phila. City Comm'rs*, No. 16-1507, 2016 WL 4721118, at *10 (E.D. Pa. Sept. 9, 2016), *aff'd*, 872 F.3d 175 (3d Cir. 2017) ("*ACRU*")

23

(Because "the Court . . . thoroughly reviewed each potentially applicable section of . . . HAVA," and found "no conflict of laws," it held state law "cannot be preempted."). Congress cannot be said to have *forbidden* counties from accepting private election grants by remaining silent on the topic in HAVA. *See Browning*, 522 F.3d at 1170; *Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 578 (6th Cir. 2004) (Ambiguous phrases in HAVA are "an insufficient basis for inferring a congressional intent to impose federal requirements upon the States."). To hold otherwise would be to treat an edict of Congress as necessary to authorize local decisionmaking— the exact opposite of how our federal system of limited central government operates.[9]

Having failed to establish conflict preemption through impossibility, Plaintiffs likewise fail to demonstrate that accepting CTCL grants poses an obstacle to accomplishing HAVA's purposes. As an initial matter, Plaintiffs mischaracterize HAVA's purpose by incorrectly alleging (without any case citations) that HAVA exists to coordinate federal and state administration of elections. Compl. ¶ 132.; *but see Democratic Nat'l Committee v. Republic Nat'l Committee*, 673 F.3d 192, 211 (3d Cir. 2012) (explaining HAVA was concerned with "updating election technologies and other election-day issues at polling places."); *Crowley v. Nevada ex rel. Nevada Sec'y of State*, 678 F.3d 730, 734 (9th Cir. 2012) (enumerating the purposes of HAVA and omitting federal-state coordination). In any event, Defendants' acceptance of grants do not offend (or even implicate) any supposed state-federal coordination purpose in HAVA. And looking to HAVA's other goals, local governments plainly do not conflict with it when they enhance local election administration.

---

[9] Although Plaintiffs omit any further argument on HAVA preemption from their brief, their Complaint alleges a conflict with HAVA because private grants "lead to deviations from the federally-approved and state-approved election administration plans and budgets." Compl. ¶ 138. Notably, Plaintiffs do not cite a *single* provision of HAVA in support of their contention that state planning documents, or any of their required contents, expressly or impliedly prohibit local governments from accepting private grants. That is because nothing in HAVA—including the provisions addressing the requirements for state plans—forbids local governments from making their own determinations about the sources of funding for election systems, or otherwise from exercising discretion over their own treasuries. *See* 52 U.S.C. §§ 21003, 21004. This argument would be foreclosed even if Plaintiffs had pursued it.

On issues that are "not specifically addressed by HAVA, Congress essentially punted to the states." *Browning*, 522 F.3d at 1172; *accord ACRU*, 2016 WL 4721118, at *10 (Where "there is no conflict of laws," there "cannot be preempt[ion]."). There is thus no preemption here.[10]

### 3.     NVRA

Like the provisions already addressed, the NVRA does not somehow impliedly preempt CTCL's grants. Indeed, Plaintiffs decline to even brief any argument in support of this claim.

Regardless, it is mistaken. In their Complaint, Plaintiffs allege that the "NVRA does not *legally authorize* local governments to accept private federal election grants for voter registration." Compl. ¶ 158 (emphasis added). But again, that misstates the relevant conflict preemption test: the question is not whether the NVRA affirmatively authorizes receipt of these grants, but instead whether acceptance of the grants renders NVRA compliance impossible or defeats impedes its purposes. Applying that test, any NVRA preemption claim fails. None of the NVRA provisions cited in the Complaint address local election funding: the statute is silent on the issue. The NVRA "regulates voter registration," not election funding, *see Gonzalez*, 677 F.3d at 402, and Plaintiffs' allegations have nothing to do with voter registration. To the extent any purpose of the NVRA is implicated, those purposes are furthered by CTCL's election grants. *See* 52 U.S.C. § 20501(b)(2) (NVRA's stated purposes include "mak[ing] it possible for Federal, State, and local governments" to "enhance the participation of eligible citizens as voters in elections for Federal office").

---

[10] Plaintiffs do not explicitly argue that the CARES Act gives rise to preemption. In arguing for HAVA preemption, however, Plaintiffs cite the CARES Act's appropriation of $400 million in HAVA funds to states to aid with election administration during the pandemic. TRO Mot. at 21. But there is nothing in this provision of the CARES Act that conflicts with (or has anything to do with) the Counties' receipt of CTCL grants. *City of Morgan*, 31 F.3d at 322. And CTCL grants obviously further, rather than conflict with, the purpose of the CARES Act's Election Security Grants, which were intended to "prevent, prepare for, and respond to coronavirus . . . for the 2020 Federal election cycle." Pub. L. No. 116-136, 134 Stat. 281 (2020); *compare id. with* Compl., Ex. A (CTCL grants are to be used for those same purposes). Because acceptance of CTCL grants and the CARES Act are in harmony of purpose, and the CARES Act does not prohibit supplementary private grants to localities (or otherwise say anything about how localities fund their election systems), the CARES Act adds nothing to Plaintiffs' deficient HAVA preemption theory.

###### 4.        Public-private partnerships

Separate from their specific statutory and constitutional arguments, Plaintiffs more broadly contend that Defendants' receipt of CTCL's grants created a supposed public-private partnership that categorically violates the Constitution. This argument is not likely to succeed on the merits because none of the cases Plaintiffs cite recognizes this asserted blanket constitutional prohibition on cooperation between government and private parties with respect to election administration— much less supports their theory that CTCL's grants violated the Constitution. At bottom, this is a policy argument decorated with irrelevant cases and lacking any basis in constitutional text.

*Young v. Red Clay Consol. Sch. Dist.*, for example, did not involve a public-private funding agreement or a federal election. 122 A.3d 784 (Del. Ch. 2015). Instead, *Young* addressed "selective get-out-the-vote efforts" by a school district, which sought to "diminish[] the voting rights of [some] and enhance[] the voting rights of [others]" by specially targeting residents likely to vote in line with the district's voting preferences. *See id.* at 837, 859. Here, Plaintiffs have not alleged anything of the sort. There is no evidence that Defendants are targeting specific residents for either favorable or unfavorable treatment, or that they are using CTCL's grants to promote or suppress voting by any group of residents. Instead, Defendants plan to use the funds to improve election administration and safety for all of their residents, regardless of political preference. See *See* Ex. F at ¶¶ 18; Ex. G at ¶¶ 5, 12-14; Ex. H at ¶¶ 4, 10; Ex. I at ¶¶ 11-14. And CTCL's grants are available to all jurisdictions on a nonpartisan basis; Defendants here represent just four of the 117 municipalities in Texas that received funds.

The three remaining cases Plaintiffs cite are even less relevant—and, like *Young*, none of them addressed a public-private partnership or impermissible sources of election funding. Two of these cases do not involve elections of any sort and are wholly inapposite. *See Board of Education of Kiryas Joel Village School District v. Grumet*, 512 U.S. 687 (1994) (Establishment Clause);

*Ferguson v. City of Charleston*, 532 U.S. 67 (2001) (Fourth Amendment). The third case involves judicial elections, albeit obliquely, addressing when an elected judge must recuse under the Due Process Clause from hearing a case involving a campaign donor. *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009). In short, Plaintiffs cite no authority supporting the theory that a private election grant accepted on politically neutral terms and applied towards nonpartisan election administration goals is somehow unconstitutional. Nor do they explain why federal law forbids Defendants from accepting funds that are authorized by Texas law. *See* TEX. LOC. GOV'T CODE § 81.032; TEX. ELEC. CODE §§ 31.043, 123.001. They cannot prevail on the merits of this claim.

*****

Because Plaintiffs lack Article III standing, lack a cause of action to pursue their claims, and advance meritless claims, they cannot establish a likelihood of success on the merits. Their motion for emergency relief should therefore be denied. *See Butts v. Aultman*, 953 F.3d 353, 361 (5th Cir. 2020) (explaining that there is no need for a federal court to address other requirements where plaintiffs cannot show a likelihood of success on the merits).

## II.     Plaintiffs cannot show a likelihood of irreparable harm and the remaining equitable factors weigh heavily against granting a TRO or preliminary injunction.

Plaintiffs' motion fails to establish a substantial threat of irreparable harm, and the remaining equitable factors foreclose the relief they seek. Their motion should be denied.

### A.     Irreparable harm

Plaintiffs are unlikely to suffer irreparable harm in the absence of a TRO for the same reasons that they fail to establish standing under Article III. The harms that Plaintiffs allege are abstract, rely on a speculative chain of inferences, and are contradicted by the available evidence. *See Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013) ("[S]peculative injury is not sufficient; there must be more than an unfounded fear on the part of

27

the applicant."). To be sure, Plaintiffs claim that they will be irreparably injured by "private unconstitutional interference" that will "damage what is to be fair and uniform elections." TRO Mot. at 22. But that harm is wholly speculative: nowhere have they explained how CTCL's grants, which benefit all residents in each of the 117 counties that received them in Texas, will damage them or the electoral process. *See Daniels Health*, 710 F.3d at 585. And tellingly, Plaintiffs do not cite a single case in which a federal court granted a TRO to prevent such a speculative harm, resorting instead to a series of cases addressing "[t]he loss of First Amendment freedoms." TRO Mot. at 22. There is no substantial risk of irreparable harm here.

### B.      The balance of the equities

The balance of equities decisively favors Defendants. Under circumstances in which speed and time are crucial considerations, Plaintiffs delayed significantly in filing this suit, undermining any claim that the equities favor them. Specifically, Plaintiffs did not file their Complaint until October 9, 2020—over 10 days after Defendants authorized acceptance of the CTCL grants. *See* Ex. F at ¶ 16; Ex. G at ¶ 14; Ex. H at ¶¶ 5-6; Ex. J at ¶¶ 3-6. Nor did Plaintiffs make any other efforts in this period of time to raise concern to Defendants about accepting CTCL's grants. It was entirely foreseeable that the funds would be spent or obligated in early October (as they have been). *See* Ex. F at ¶¶ 20-21; Ex. G at ¶ 17-18; Ex. H at ¶ 10; Ex. I at ¶¶ 12, 16. Now, having dawdled, Plaintiffs suddenly seek "extraordinary and drastic" injunctive relief. *CoreClarity*, 2020 WL 5095130, at *2. For that reason, equity cut strongly against their position. *See, e.g.*, *Parker v. Dacres*, 130 U.S. 43, 50 (1889) (noting "the principle upon which courts of equity uniformly proceed . . . of refusing relief to those who unreasonably delay to invoke their aid").

### C.      The public interest

The public interest weighs firmly against granting Plaintiffs' requested for extraordinary, emergency relief. Defendants are using the grant monies they have received to facilitate safe, secure, and efficient voting for all residents amid unprecedented circumstances. This is a public and constitutional interest of the highest order. In contrast, Plaintiffs assert an interest in stripping funds from election administration systems based on an entirely conjectural fear that certain residents will be more likely to vast ballots if county-wide election systems are improved through use of funds provided by CTCL. Making it harder for properly registered Texans to vote safely and securely is not in the public interest, even where a handful of residents theorize (despite the evidence available to them) that doing so is in their narrow partisan self-interest.

Under the *Purcell* principle, Plaintiffs' requested relief is especially inappropriate given the proximity of Election Day. As the Supreme Court warned in *Republican National Committee v. Democratic National Committee*, 140 S. Ct. 1205 (2020) (per curiam): "[L]ower federal courts should ordinarily not alter the election rules on the eve of an election." *Id.* at 1207; *see also Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (per curiam); *Mi Familia Vota v. Abbott*, No. 20-50793, at 16-17 (5th Cir. Oct. 14, 2020) ("The Plaintiffs seek to overhaul Texas's voting scheme. Early voting in Texas commenced October 13, 2020. The changes sought by the Plaintiffs by and large would up-end the process."). The concerns animating *Purcell* apply in full force here: Defendants have prepared for the election, now weeks away, relying on the funding that Plaintiffs seek to rip away. This point is confirmed by specific testimony from county officials charged with election administrators. See Ex. F at ¶ 22; Ex. G at ¶¶ 17-18; Ex. H at ¶ 11; Ex. I at ¶¶ 16-17. To disrupt the Counties' reasonable expectations at the "eleventh hour," as Plaintiffs request, would require last-minute modifications to the administration of the ongoing election across each Defendant

County, sowing chaos and confusion that would affect millions of Texans. *See Veasey v. Perry*, 769 F.3d 890, 895 (5th Cir. 2014). That is particularly disruptive where, as here, "[t]he state election machinery is already well in motion" and preserving the status quo "will minimize confusion among both voters and trained election officials." *Texas Alliance for Retired Americans v. Hughs*, --- F.3d ----, 2020 WL 5816887, at *4 (5th Cir. Sept. 30, 2020) (staying a district court's preliminary injunction). Given the weakness of Plaintiffs' claims, and speculative nature of their alleged harms, the public interest would be especially disserved by granting Plaintiffs' motion.

## CONCLUSION

For the reasons set forth above, Plaintiffs' motion for a temporary restraining order should be denied.

Dated:  October 15, 2020                    Respectfully submitted,

                                            */s/ Justin A. Nelson*
                                            Justin A. Nelson (Bar No. 24034766)
                                            **SUSMAN GODFREY L.L.P.**
                                            1000 Louisiana Street, Suite 5100
                                            Houston, Texas 77002
                                            Telephone: (713) 651-9366
                                            Facsimile: (713) 654-6666
                                            jnelson@susmangodfrey.com

                                            */s/ Dustanna Rabe*
                                            Dustanna Rabe
                                            Hopkins County Attorney * *not admitted in EDTX*
                                            State Bar No. 24002332
                                            128 Jefferson St., Suite B
                                            Sulphur Springs, TX 75482
                                            Telephone: (903) 438-4017
                                            rabe@hopkinscountytx.org
                                            *Attorney for Defendant Hopkins County*

Vince Ryan                                  */s/ Cameron A. Hatzel*
Harris County Attorney                      Cameron A. Hatzel, Assistant County Attorney
                                            State Bar No. 24074373
                                            1019 Congress, 15th Floor
                                            Houston, Texas 77002

Telephone: (713) 274-5376
Telecopier: (713) 755-8924
cameron.hatzel@cao.hctx.net

*/s/ Susan Hays*
Susan Hays
Law Office of Susan Hays, PC
State Bar No. 24002249
P.O. Box 41647
Austin, Texas 78704
Telephone: (214) 557-4819
Telecopier: (214) 432-8273
hayslaw@me.com
*Attorney for Defendant, Harris County*

*/s/ Michael A. Shaunessy*
Michael A. Shaunessy
Mcginnis Lochridge LLP
State Bar No. 18134550
600 Congress Ave., Suite 2100
Austin, Texas 78701
(512) 495-6000
(512) 495-6093 Fax
mshaunessy@mcginnislaw.com
*Attorney for Defendant Russell Hayter, Hays County*

*/s/ Jason G. Schuette*
John Creuzot, Criminal District Attorney, Dallas
County, Texas
Jason G. Schuette [with permission]
[pro hac vice admission pending]
Assistant District Attorney
Texas State Bar No. 17827020
jason.schuette@dallascounty.org

*/s/ Russell H. Roden*
Russell H. Roden
Assistant District Attorney
Texas State Bar No. 17132070
russell.roden@dallascounty.org
Earl S. Nesbitt
Assistant District Attorney
Texas State Bar No. 14916900
earl.nesbitt@dallascounty.org
Randall Miller [pro hac vice admission pending]
Assistant District Attorney

31

Texas State Bar No. 24059181
randall.miller@dallascounty.org
Dallas County Administration Building
411 Elm Street, 5th Floor
Dallas, Texas  75202
Telephone: 214-653-3692
Telecopier: 214-653-6134
*Attorneys for the Defendant, Dallas County*

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been served via ECF on all counsel of record, this 15th day of October 2020.

*/s/ Justin A. Nelson*
Justin A. Nelson