# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| TEXAS VOTERS ALLIANCE, DONNIE WISENBAKER, ALAN VERA, RUSSELL HAYTER, AND WARREN JOHNSON, | § § § § | |
| *Plaintiffs*, | § § | CIVIL ACTION NO.  4:20-CV-00775 |
| | § | Judge Mazzant |
| v. | § § | |
| DALLAS COUNTY, HARRIS COUNTY, HAYS COUNTY, AND HOPKINS COUNTY, | § § § § | |
| *Defendants*. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

The Court first acknowledges and unequivocally recognizes that its sole function is to interpret the existing law.  It is not within the purview of the Court to formulate new law or pass judgment upon what the law should be, for "judicial power is never exercised for the purpose of giving effect to the will of the Judge" but instead is exercised only to give effect "to the will of the law." *Osborn v. Bank of the United States*, 22 U.S. (9 Wheat.) 738, 866 (1824).  When confronted with an issue concerning "a host of considerations that must be weighed and appraised," such as the one presented before the Court, the considerations "should be committed to 'those who write the laws' rather than 'those who interpret them.'" *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017) (internal quotation marks omitted in first quotation) (quoting *Bush v. Lucas*, 462 U.S. 367, 380 (1983)).

The Court remains especially mindful of its role as a neutral arbiter in election-related cases.  A citizen's right to choose their elected officials "in a free and unimpaired fashion is a

bedrock of our political system." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964).  For the reasons stated herein, Plaintiffs' Motion for Temporary Restraining Order (Dkt. #2) is **DENIED**.

## BACKGROUND

This case arises from the Center for Tech and Civic Life ("CTCL")—through $300 million in funding provided by Mark Zuckerberg and Priscilla Chan—awarding and distributing federal election grants to Texas counties.  CTCL—a nonpartisan, nonprofit organization—offers COVID-19 relief election administration grants to counties and cities as supplemental funding to ensure the safety of voters.  All counties and cities in the United States are eligible to apply for funds under the grants, regardless of the political affiliation of their officials or the voting tendencies of their electorates.  The funding from these grants is intended to ensure that voting is a safe, secure, and effective exercise.  Specifically, these grants cover expenses associated with: (1) ensuring safe and efficient election day administration; (2) expanding voter education and outreach efforts; (3) launching poll worker recruitment, training, and safety efforts; and (4) supporting early in-person voting and voting by mail. To be considered for a grant, applicants need only submit basic information—such as the number of active registered voters in the jurisdiction, the number of full-time staff on the election team, the election office's budget, and a W-9.  CTCL approves the application of every eligible election department and subsequently awards these departments a minimum of $5,000.  CTCL does not request or consider any partisan criteria.

Almost half of the 254 counties in Texas applied for CTCL grants.  The overwhelming majority of those counties voted for the Republican presidential candidate in 2016.  CTCL subsequently awarded funding to each county.  Four of the counties that applied and received grants were Dallas County, Harris County, Hays County, and Hopkins County (collectively, the "Counties").  Dallas County received approximately $15.1 million from CTCL, Harris County

received $9.6 million, Hays County received $289,075, and Hopkins County received $19,952. The Counties have since either spent or irrevocably committed a large fraction of the funds they received from the grants.

Plaintiffs Texas Voters Alliance, Donnie Wisenbaker, Alan Vera, Russell Hayter, and Warren Johnson (collectively, the "Plaintiffs") do not want progressive candidates to "win" the November 3rd election (Dkt. #1 at p. 7).  Plaintiffs allege that CTCL's grants "are targeted to counties and cities with progressive voter patterns—resulting in more progressive votes and a greater chance that progressive candidates will win" (Dkt. #1 at p. 7). Plaintiffs sue to challenge CTCL's award to the four abovementioned counties.

On October 9, 2020, Plaintiffs filed their Complaint (Dkt. #1).  Contained within Plaintiffs' Complaint was their request for both declaratory and injunctive relief.  That same day, Plaintiffs filed the present Motion for Temporary Restraining Order (Dkt. #2).  On October 15, 2020, Counties filed their Response (Dkt. #19).  On October 16, 2020, the Court held a hearing on the Motion (Dkt. #22).  Shortly after the hearing, Counties submitted Defendants' Notice of Supplemental Authority (Dkt. #23).

## LEGAL STANDARD[1]

"A preliminary injunction is an 'extraordinary remedy.'"  *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 536 (5th Cir. 2013) (quoting *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009)).  "To be entitled to a preliminary injunction, the applicants must show (1) a substantial likelihood that they will prevail on the merits, (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted, (3) their substantial injury outweighs the

---

[1]  The Court recognizes that Plaintiffs style their Motion as one seeking a temporary restraining order.  However, due to the arguments of both Parties and the impending election date, the Court instead analyzes the Motion as one for a preliminary injunction.

threatened harm to the party whom they seek to enjoin, and (4) granting the preliminary injunction will not disserve the public interest." *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012) (brackets and citations omitted).  The party seeking preliminary injunctive relief must clearly carry the burden of persuasion on all four elements.  *Id.*  The decision whether to grant a preliminary injunction lies within the sound discretion of the trial court.

## ANALYSIS[2]

Plaintiffs first ask this Court to enter declaratory relief against the Counties.  More specifically, Plaintiffs seek a declaration that the Counties acted ultra vires in accepting CTCL's private federal election grants.  Plaintiffs also request this Court enjoin the Counties from both (1) accepting or using CTCL's private federal election grant, or items purchased with CTCL's private federal election grant, and similar private federal election grants and (2) soliciting or participating in public-private partnerships with CTCL unless the same are first approved by the State of Texas.

In support of their requests, Plaintiffs advance the argument that the Counties acted ultra vires in forming public-private partnerships for federal election administration with CTCL by accepting and using CTCL's private federal election grant because preemption applies under the

---

[2] While neither party raised the issue in their pleadings, the Court is not assured it has subject matter jurisdiction to decide this case due to sovereign immunity's jurisdictional bar.  *Bryant v. Tex. Dep't of Aging & Disability Servs.*, 781 F.3d 764, 769 (5th Cir. 2015) ("When the Eleventh Amendment applies, courts lack subject-matter jurisdiction over the claim."); *see generally, e.g.*, Bradford R. Clark, *The Eleventh Amendment and the Nature of the Union*, 123 HARV. L. REV. 1817 (2010).  "Federal courts must address jurisdictional questions whenever they are raised and must consider jurisdiction *sua sponte* if not raised by the parties." *S J Associated Pathologists, P.L.L.C. v. Cigna Healthcare of Tex., Inc.*, 964 F.3d 369, 373 n.3 (5th Cir. 2020) (brackets and internal quotation marks omitted) (quoting *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 919 (5th Cir. 2001)); *see* FED. R. CIV. P. 12(h)(3).  While aware that sovereign immunity normally does not "afford protection to political subdivisions such as counties and municipalities," *Lake Country Ests., Inc. v. Tahoe Reg'l Plan. Agency*, 440 U.S. 391, 401 (1979), the Court remains uncertain if sovereign-immunity protections extend to the Counties as "arms of the State" in the context of election administration. *See N. Ins. Co. of N.Y. v. Chatham Cnty., Ga.*, 547 U.S. 189, 193 (2006).  Because of the time-sensitive nature of this litigation, the Court assumes without deciding that the Counties are not protected by sovereign immunity.  *See also McDonald v. Bd. of Miss. Levee Comm'rs*, 832 F.2d 901, 906 (5th Cir. 1987) (explaining that the issue of sovereign immunity can be addressed and resolved on appeal even if not previously raised by the parties or addressed by the district court below).

Elections Clause, Supremacy Clause, the Help Americans Vote Act ("HAVA"), and the National

Voter Registration Act ("NVRA").[3]

Defendants respond by presenting arguments couched within the factors that the Court

considers when determining whether to issue a preliminary injunction.   The Counties make three

arguments as to why Plaintiffs cannot establish a likelihood of success on the merits: (1) Plaintiffs

lack standing; (2) Plaintiffs lack a cause of action for their claims under the Supremacy Clause and

HAVA; and (3) Plaintiffs are unlikely to succeed on the merits of their preemption arguments

under the Elections Clause, HAVA, and public-private partnerships.  Defendants further argue that

Plaintiffs cannot show a likelihood of irreparable harm and that the remaining equitable factors

weigh heavily against granting a preliminary injunction.

The Court will first address the standing arguments and then proceed to the consider the

four preliminary injunction factors.

## I.     Standing

"[S]tanding is not, and must not be, a guessing game."  *Kumar v. Frisco Indep. Sch. Dist.*,

443 F. Supp. 3d 771, 788 (E.D. Tex. 2020).  Thus, the Court must first determine whether Plaintiffs

have standing to bring the present suit.  Article III standing requires that a plaintiff show an injury-

in-fact that is fairly traceable to the challenged action of the defendant and is likely to be redressed

by the plaintiff's requested relief.  *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019) (citing

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  Standing requirements are divided into

---

[3] Plaintiffs initially appeared to plead that a cause of action also existed under the NVRA.  At the October 16th hearing, Plaintiffs stated that they do not believe such private cause of action was available to them (Dkt. #26 at p. 59:1–3). Therefore, the Court does not address this argument.  Further, in their pleadings, Plaintiffs asserted a NVRA preemption claim.  However, at the October 16th hearing, Plaintiffs appeared to denounce the assertion when questioned further upon it (Dkt. #26 at p. 59:1–3).  Thus, the Court does not address this argument.  Even if the Court did address the NVRA claim, it would not change the Court's decision.  The NVRA does not address funding, thus making it inapposite to the present arguments.  *See* National Voting Rights Act of 1993, Pub. L. No. 103–31, 107 Stat. 77.

three components: (1) injury-in-fact; (2) causation; and (3) redressability.  *Id.* at 720.  Plaintiffs bear the burden of establishing all three elements.  *Id.*

"Requests for injunctive and declaratory relief implicate the intersection of redressability and injury-in-fact requirements."  *Id.*  Relief is limited by the redressability requirement to "that which is likely to remedy the plaintiff's alleged injuries."  *Id.*  "Because injunctive and declaratory relief 'cannot conceivably remedy any past wrong,'" plaintiffs seeking these types of relief "can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury."  *Id.* (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)).  "That continuing or threatened future injury. . . must be an injury in fact."  *Id.* (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

A threatened injury qualifies as an injury-in-fact if three requirements are met: (1) the injury is "potentially suffered by plaintiff, not someone else"; (2) it is "concrete and particularized, not abstract"; and (3) the injury is "actual or imminent, not conjectural or hypothetical."  *Id.* at 720–21.  A threatened injury must be imminent "to ensure that the alleged injury is not too speculative for Article III purposes."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  The imminence requirement for a threatened injury is satisfied only if there is "at least a 'substantial risk' that injury will occur."  *Id.* (quoting *Susan B. Anthony List*, 573 U.S. at 158).

### A.  Injury-in-Fact

Plaintiffs have failed to allege an injury sufficient to establish an injury-in-fact.  An injury-in-fact requires Plaintiffs' pleadings and proof to show that they have suffered "'the invasion of a legally protected interest' that is 'concrete and particularized,' *i.e.*, which 'affects . . .  [P]laintiff[s] in a personal and individual way."  *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (citing *Lujan*, 504 U.S. at 560 & n.1).

Plaintiffs make blanket assertions to establish an injury-in-fact.  Plaintiffs state that they were injured by the grants from CTCL, contending that the grants target counties and cities with progressive voting patterns, thus resulting in more progressive votes.  The alleged influx of progressive votes allegedly harms Plaintiffs because, as blatantly stated in Plaintiffs' Complaint, they do not want a progressive candidate to win the November 3rd election (Dkt. #1 at p. 7).  Further, Plaintiffs believe that the grants impermissibly influence the election and could *potentially* lead to disenfranchisement of voters.  Making these naked assertions without further evidence, however, does not make them true.

The Supreme Court has held that an interest "in influencing the legislature's overall composition and policymaking" is not the "individual and personal injury of the kind required for Article III standing."  *Gill*, 138 S. Ct. at 1931.  Here, Plaintiffs allege an injury that is "the kind of undifferentiated, generalized grievance about the conduct of government that [the Supreme Court] has refused to countenance in the past."  *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (per curiam).  The Supreme Court goes on to state "[a] citizen's interest in the overall composition of the legislature is embodied in his right to vote for his representative.  And the citizen's abstract interest in policies adopted by the legislature on the facts here is a nonjusticiable 'general interest common to all members of the public.'"  *Id.* (citing *Ex parte Levitt*, 302 U.S. 633, 634 (1937) (per curiam)).  Merely alleging that the grants may influence the election result and lead to possible disenfranchisement is not an injury-in-fact.

Plaintiffs cite to a Delaware state court case to support a finding Article III standing.  In *Young v. Red Clay Consolidated School District*, the defendant sought voters' approval of a tax increase.  122 A.3d 784, 790 (Del. Ch. 2015).  In finding voter approval, Red Clay "encouraged and facilitated voting by families with children, who Red Clay believed would support the tax

7

increase because of their desire to fund the schools that their children attended." *Id.* "At the same time, Red Clay discouraged and raised impediments to voting by elderly and disabled residents, who Red Clay believed would oppose the tax increase because many of them lived on fixed incomes." *Id.* Here, Plaintiffs fail in their attempt to couch their argument in *Red Clay*. The facts before the Court do not reflect government action favoring a demographic group as Plaintiffs allege. Rather, the grants appear to make it *easier* for *more* residents to vote. As the Fifth Circuit recently noted, it is a "mystery" how the "expansion of voting opportunities burdens anyone's right to vote." *Tex. League of United Latin Am. Citizens v. Hughs*, No. 20-50867, 2020 WL 6023310, at *5 (5th Cir. Oct. 12, 2020).

A person's right to vote, however, is an interest that is personal and of the kind required for Article III standing. *Gill*, 138 S. Ct. at 1929 ("We have long recognized that a person's right to vote is 'individualized and personal in nature.'" (quoting *Reynolds,* 377 U.S. at 561). "Thus, voters who allege facts showing disadvantage to themselves as individuals have standing to sue to remedy that disadvantage." *Id.* (internal quotation marks omitted) (quoting *Baker v. Carr*, 369 U.S. 186, 201 (1962)). Here, Plaintiffs are not claiming *their* right to vote is being disadvantaged. Rather, the grants allow easier voting for all. Plaintiffs are merely alleging that this wider access *may* lead to a result with which they disagree.

At the October 16th hearing before the Court, Plaintiffs alleged that a possible violation of the law might exist and because of that violation, the plaintiffs—as private citizens—have standing to bring suit and stop any unlawful action. This is not the case. Federal courts are not "forum[s] for generalized grievances." *Lance*, 549 U.S at 440. "To have standing, . . . a plaintiff must have more than a 'general interest common to all members of the public.'" *Id.* (quoting *Ex parte Levitt*, 302 U.S. at 634). When the only injury Plaintiffs allege is that "the law . . . has not been followed,"

that is "precisely the undifferentiated, generalized grievance about the conduct of government that [the Supreme Court] ha[s] refused to countenance in the past." *Id*. at 442.

Plaintiffs further claimed at the October 16th hearing that if the Court were to agree with them on the merits, the Court must then necessarily find standing. This is also not an accurate statement. Injury-in-fact is a constitutional requirement, and "[i]t is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997) (citing *Gladstone Realtors v. Vill. Of Bellwood*, 441 U.S. 91, 100 (1979)). And as Justice Thomas noted in his concurrence in *Spokeo*, "Congress cannot authorize private plaintiffs to enforce *public* rights in their own names, absent some showing that the plaintiff has suffered a concrete harm particular to him." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1553 (2016) (Thomas, J., concurring). Thus, assuming the Court would agree that there has been a statutory violation, Plaintiffs are still required to show an injury is both particularized and affects Plaintiffs in a personal and individual way— which they have failed to do.

Plaintiffs also argued that the grants create a public-private partnership between the Counties and the CTCL that is constitutionally impermissible. In support of their argument, Plaintiffs referred the Court to *Caperton v. A.T. Massey Coal Co., Inc*. In *Caperton*, the Supreme Court found that a corporation's three-million-dollar campaign donation to the state supreme court judge—after the trial court entered a fifty-million-dollar judgment against the corporation—was impermissible. *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 889–90 (2009). *Caperton* is easily distinguishable from the facts of this case. To begin, as the Supreme Court noted, "[n]ot every campaign contribution by a litigant or attorney creates a probability of bias that requires a judge's recusal, but this is an *exceptional* case." *Id*. at 884 (emphasis added). The Court finds it

important to note that *Caperton* was an exceptional case.  The facts here are not as exceptional as a corporation choosing to contribute a substantial amount of money to a judge that will subsequently hear their appeal.  Further, election judges in Texas are appointed, not elected.  State judges run in partisan elections and must listen to their constituents in hopes to be reelected.  The risks of bias and influence for state judges comes from the partisan elections, but such concerns are not present for appointed positions.[4]

Plaintiffs' next argument is that the congressional representative for their district might not be seated because these grants would influence the election.[5]  If the grants did in fact influence the election and a citizen challenged the results on that basis, Plaintiffs claim that the House may decide that the chosen representatives are not qualified—thus depriving Plaintiffs of their representative.  Plaintiffs direct the Court to Article I, § 5 of the Constitution in support of this argument.  This section states that "[e]ach House shall be the Judge of the Elections, Returns and Qualifications of its own Members."  U.S. CONST. art. I, § 5, cl. 1.  Reading the Constitution's plain language, this section does not state that an *Article III court* will be the Judge of the Elections, Returns and Qualifications of the Members. Thus, the Court declines to meddle in Congress's internal governance or provide an advisory opinion on the potential issue.

Plaintiffs also ask the Court to find new possible theories of harm under *Gill v. Whitford*. Plaintiffs point to where the Supreme Court stated "[w]e leave for another day consideration of other possible theories of harm not presented here and whether those theories might present justiciable claims giving rise to statewide remedies."  *Gill*, 138 S. Ct. at 1931.  Setting aside the

---

[4] Plaintiffs also cite to *Board of Education of Kiryas Joel Village School District v. Grumet*, 512 U.S. 687 (1994), and *Ferguson v. City of Charleston*, 532 U.S. 67 (2001), in support of their public-private partnership argument. The Court finds these cases inapposite here.
[5] At the October 16th hearing, Plaintiffs asserted each individual plaintiff was from one of the counties which they sued, but Plaintiffs did not plead where any of the individual plaintiffs resided.

fact that the Supreme Court in *Gill* found the issues presented were nonjusticiable, the Court declines to tread into uncharted waters searching for new possible theories of harm given the time-sensitive nature of this case with the fast approaching November 3rd election.

### B.   Causal Connection

Even assuming that a statutory violation existed or that potentially influencing an election constituted an injury, it is difficult to trace the complained injury to the challenged action.   The Supreme Court has noted that a plaintiff need not "demonstrate that it is literally certain that the harms they identify will come about."   *Clapper*, 568 U.S. at 414 n.5.   "In some instances, [the Supreme Court has] found standing based on a 'substantial risk' that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid the harm."   *Id.* (citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153–54 (2010)).   Even with the "substantial risk" standard, Plaintiffs still fall short in light of the attenuated claim of inferences necessary to find harm here.   *See id.*

To trace the complained-of action to the alleged harm, the Court must assume the grants targeted specific counties.   Further, the Court must assume the grants will drive out more voters of a specific political leaning and that the grants will influence the election, and, as a result, Plaintiffs will be dissatisfied with the outcome of the election.   Plaintiffs' assertions are like throwing a breadcrumb trail on a windy, north Texas afternoon.   The Court cannot find a causal connection "in light of the attenuated claim of inferences necessary to find harm here."   *Id.*

### C.   Redressability

"To obtain equitable relief for past wrongs, a plaintiff must demonstrate either continuing harm or a real and immediate threat of repeated injury in the same future.   Similar reasoning has been applied to suits for declaratory judgments."   *Bauer v. Texas*, 341 F.3d 352, 358 (5th Cir.

2003).  Here, Plaintiffs state "[t]his Court's favorable decision will redress the plaintiffs' injuries and allow them to enjoy their rights to legally-authorized, uniform and fair federal elections guaranteed under federal law" (Dkt. #1 at p. 8).  Plaintiffs further request that this Court:

> Grant declaratory relief that the Counties have acted ultra vires, acted without legal authority, in accepting CTCL's private federal election grants. Issue an injunction enjoining Dallas, Harris, Hayes and Hopkins County from accepting or using CTCL's private federal election grant, or items purchased with CTCL's private federal election grant, and similar private federal election grants. Issue an injunction enjoining Texas counties and cities from soliciting or participating in public private partnerships with CTCL unless the same are first approved by the State of Texas.

(Dkt. #1 at p. 32). The Court will address each request in turn.

First, Plaintiffs ask this Court to grant declaratory relief determining that the Counties have acted ultra vires.  The alleged ultra vires act Plaintiffs allege is the Counties' past actions in accepting the grants.  Due to the past nature of the wrong, Plaintiffs must demonstrate either continuing harm or a real and immediate threat of repeated injury in the future.  *Bauer*, 341 F.3d at 358.  As discussed above, it is unclear that Plaintiffs have suffered an injury, let alone a continuing injury that may be repeated in the future. Further, even assuming that the requirements of Article III standing in this respect are minimally met, the Court can consider prudential standing considerations in reaching its decision that declaratory relief is not warranted in this case. *See id.* at 358–59.

Plaintiffs argue the grants injure them because the grants "are targeted to counties and cities with progressive voter patterns" (Dkt. #1 at p. 1).  The first issue arises when noting that the Counties themselves did not "target" anyone. Rather, CTCL—an organization not presently before the Court—would presumably be the bad actor "targeting" the Counties.  Plaintiffs' argument also fails because (1) not all of the four counties in this suit are historically progressive and (2) the Counties themselves requested the funds.  Additionally, Plaintiffs' own arguments do not align.

On one hand, Plaintiffs' claim the Counties' actions unconstitutionally influence electoral outcomes causing the ultra vires issue.  On the other hand, Plaintiffs argue that simply accepting the grants constitute an ultra vires act.  Plaintiffs' claimed harm—that the elections will be unconstitutionally influenced—are essentially independent from any potential ultra vires act, namely: accepting the grants.  Therefore, declaratory relief is not appropriate in this case.

Second, Plaintiffs ask this Court to enjoin the Counties from accepting the funds from CTCL or using either CTCL's grants or items purchased with the grants.  Enjoining the Counties from accepting future grants would be a simple task.  However, preventing the Counties from using money already received and the items already purchased is an impossible task.  To begin, the elections in November are not solely federal elections.  They are also state elections.  Polling locations are used for both state and federal elections.  With early voting already underway, the Court is hesitant to interfere with the election process, especially noting the entanglement with state elections.  Further, the funds the Counties received have likely been commingled with other funds, and items purchased with the commingled funds will be impossible to trace back to the grants.

Finally, Plaintiffs ask this Court to enjoin the Counties from soliciting or participating in public-private partnerships with CTCL unless the same are first approved by the State of Texas.  Again, Plaintiffs have failed to demonstrate either a continuing harm or a real and immediate threat of repeated injury in the future.  Even assuming the Counties did act improperly, enjoining their future actions will not undo the grants already received or "un-influence" the ongoing election.

For redressability to exist, there must be a likelihood that the requested relief will fix the alleged injury.  The Court sees no way to differentiate the supposedly partisan hand sanitizer from

the impartial.  The Court cannot undo the early votes already cast.  And the Court is unable to grant relief that would effectively redress the alleged injury Plaintiffs claim to suffer.

### D.  Organizational Standing

The analysis for the individual plaintiffs and the Texas Voters Alliance is the same.  "An organization has standing to sue on its own behalf if it meets the same standing test that applies to individuals." *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1992)).  "That standard, at its 'irreducible constitutional minimum,' requires that the plaintiff demonstrate that he or she has suffered injury in fact, that the injury is fairly traceable to the actions of the defendant, and that the injury will likely be redressed by a favorable decision."  *Id.* (citing *Bennett v. Spear*, 520 U.S. 154, 162 (1997)).  The organization's claimed injury must be "more than simply a setback to the organization's abstract societal interests."  *Havens Realty Corp.*, 455 U.S. at 379 (citing *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)).

For a party claiming organizational standing, the organization must "identify members who have suffered the requisite harm."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).  In 2020, the Fifth Circuit followed *Summers* in finding an organization had an injury-in-fact for purposes of standing when "at least one of [the organization's] members regularly saw flares, smoke, and haze coming from the complex; smelled chemical odors; suffered from allergy-like or respiratory problems; feared for their health; refrained from outdoor activities; or moved away. Each of those experiences was an Article III injury."  *Env't Tex. Citizen Lobby v. Exxonmobile Corp.*, 968 F.3d 357, 368 (5th Cir. 2020).

Texas Voters Alliance has not identified any members of the organization, nor has it alleged the individual plaintiffs to this suit are members.  Even assuming they are, Texas Voters

Alliance has not identified a concrete injury that is distinct from the injury claimed by the individual plaintiffs.  Plaintiffs state that "[t]he injury to the plaintiffs is real and concrete" to bolster their assertion that there is an injury-in-fact (Dkt. #1 at p. 8).  As discussed above, Texas Voters Alliance's does not have standing to bring their grievance about the electoral outcome.  *See Gill*, 138 S. Ct. at 1931.  Texas Voters Alliance has failed to establish standing in its own right, and it cannot establish representational standing because its members cannot establish standing either.

### E.  Dillon Rule

At the October 16th hearing, Plaintiffs raised an argument couched within the Dillon Rule.[6] Plaintiffs cite to a 1907 Supreme Court case to support their assertion that local subdivisions of state governments have no inherent powers.  In *Hunter v. City of Pittsburgh*, the Supreme Court states, "[m]unicipal corporations are political subdivisions of the state, created as convenient agencies for exercising such of the governmental powers of the state as may be intrusted [sic] to them."  207 U.S. 161, 178 (1907).  Though the local subdivisions may not have inherent authority, the State has "absolute discretion" when conferring the "number, nature, and duration" of power to the local subdivisions.  *Id*.

Examples exist where the State has authorized local subdivisions to exert certain powers. In § 81.032 of the Local Government Code, the Texas legislature has decided that "[t]he commissioners court may accept a donation of labor or services, gift, grant, . . . or other property

---

[6] As stated by John F. Dillon, the rule's namesake:

> It is a general and undisputed proposition of law that a municipal corporation possesses and can exercise the following powers, and no others: First, those granted in express words; second, those necessarily or fairly implied in or incident to the powers expressly granted; third, those essential to the declared objects and purposes of the corporation,—not simply convenient, but indispensable.

1 JOHN F. DILLON, COMMENTARIES ON THE OF MUNICIPAL CORPORATIONS § 89, at 145 (4th ed. 1890).

on behalf of the county . . .  for the purpose of performing a function conferred by law on the county or county officer." TEX. LOC. GOV'T CODE ANN. § 81.032.  Though not binding authority, there are election law opinions from the Texas Secretary of State debunking Plaintiffs' assertion that accepting funds is in and of itself an ultra vires act.  Former Secretary of State Gwyn Shea notes the Secretary of State's office "could not find an outright statutory prohibition" for counties accepting donations, but that counties should be cautious when—in situations not applicable here—there are conditions placed on the grants. Tex. Sec'y State Op. No. GS-1 (2002) (discussing § 81.032 of the Local Government Code and whether it permitted counties to accept donations to pay for temporary branch early voting polling places).  Ultimately, the Court determines that Plaintiffs' arguments fail because the Dillon Rule is inapposite in this case

## II.    Preliminary Injunction

Even if the Court found standing, Plaintiffs would still need to satisfy the elements of a preliminary injunction to be granted the relief they seek.  Plaintiffs fail to do so here.

As previously stated, a preliminary injunction is an extraordinary remedy and may be awarded only after a clear showing by Plaintiffs that (1) there is a substantial likelihood that they will prevail on the merits; (2) they will suffer an irreparable injury absent the preliminary injunction; (3) their substantial injury outweighs the harm to the Counties; and (4) granting the preliminary injunction will not disserve the public interest.  *See Google, Inc. v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016).  Bearing in mind at all times that granting a preliminary injunction is appropriate only when "the policy of preserving the court's power to decide the case effectively outweighs the risk of imposing an interim restraint before it has done so," 11A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2947 (3d ed. 2007), the Court will address each element in turn.

### A.  Likelihood of Success on Merits

The Court first looks to Plaintiffs' substantial likelihood of success on the merits of their claims.  To satisfy this element, Plaintiffs are "not required to prove [their] entitlement to summary judgment."  *Byrum*, 566 F.3d at 446.  Certainty of success is not the standard—substantial likelihood is, which means that success on the merits must be "considerably more likely" than not. *United States v. Thorn*, 317 F.3d 107, 117 (2d Cir. 2003).  To make this determination, the Court looks to the standards for the causes of action pleaded as provided by substantive law.  *Sepulvado v. Jindal*, 729 F.3d 413, 418 (5th Cir. 2013).

The analysis that follows is broken down into three parts.  First, the Court examines the availability of the causes of actions pleaded by Plaintiffs.  Next, the Court looks to the issue of preemption.  Finally, various remaining arguments Plaintiffs offer are addressed.

### a.  Availability of Causes of Action

Neither the pleadings nor arguments of counsel at the October 16th hearing are entirely clear concerning Plaintiffs' alleged causes of action.  Plaintiffs appear to argue that they have pleaded causes of action based on three discrete theories: (1) HAVA, (2) the Supremacy Clause, and (3) the Elections Clause.  The Court analyzes HAVA first and then turns to the constitutional claims.[7]

### i.  HAVA

Congress enacted the Help America Votes Act (HAVA) following the 2000 presidential election.  Pub. L. No. 107–252, 116 Stat. 1666 (2002) (codified in scattered sections of 2, 5, 10, 36, and 52 U.S.C.).  HAVA's preamble announces its purpose:

---

[7] Because Plaintiffs lack standing, the Court is not required to analyze the availability of the causes of action Plaintiffs pleaded.  *See Shrimpers & Fishermen of RGV v. Tex. Comm'n on Env't Quality*, 968 F.3d 419, 423 (5th Cir. 2020) ("We need not decide whether Petitioners have a cause of action because they do not have standing.").  But the Court does so to ensure an expedient and steadfast resolution of the suit.

> To establish a program to provide funds to States to replace punch card voting systems, to establish the Election Assistance Commission to assist in the administration of Federal elections and to otherwise provide assistance with the administration of certain Federal election laws and programs, to establish minimum election administration standards for States and units of local government with responsibility for the administration of Federal elections, and for other purposes.

*Id.*  In short, HAVA serves to improve access to and the administration of federal elections.

Plaintiffs argue that HAVA "confers a private cause of action" to them (Dkt. #1 at p. 5).[8] At the October 16th hearing, Plaintiffs further clarified their position by stating that the private right of action under HAVA comes from 52 U.S.C. §§ 21111–12.  Plaintiffs urged that if the Court did not agree with this argument, then the HAVA statutory scheme implies a private cause of action for Plaintiffs (Dkt. #26 at p. 8:14–17).  Each argument is addressed in turn.

HAVA does not expressly create a private right of action.  The starting point for statutory analysis is the text itself.  *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98 (2003).  When examining the law's language, the Court "must presume that Congress 'says in a statute what it means and means in a statute what it says there.'"  *Rotkiske v. Klemm*, 140 S. Ct. 355, 360 (2019) (quoting *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 254 (1992)).  And in most situations, "judicial inquiry is complete" when the "terms of a statute [are] unambiguous."  *Rubin v. United States*, 449 U.S. 424, 430 (1981); *see Tex. Educ. Agency v. United States Dep't of Educ.*, 908 F.3d 127, 132 (5th Cir. 2018) ("The judicial inquiry thus 'begins with the statutory text, and ends there as well if the text is unambiguous.'" (quoting *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (plurality opinion))).

---

[8] Plaintiffs also claim that HAVA confers standing as well (Dkt. #1 at p. 5).  The problem with this argument is that statutes cannot alone confer legal standing—a plaintiff must also have constitutional standing under Article III. *Hodgson v. Bowerbank*, 9 U.S. (5 Cranch) 303, 304 (1809) ("Turn to the article of the constitution of the United States, for the statute cannot extend the jurisdiction beyond the limits of the constitution.").  For the purposes of analyzing substantial likelihood of success on the merits, though, the Court momentarily sets this consideration aside.

Such is the case here.  By its terms, HAVA provides two enforcement mechanisms.  First, the Attorney General may bring actions for injunctive and declaratory relief "as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements" under various HAVA provisions.  52 U.S.C. § 21111.  Second, "any person who believes that there is a violation of any provision of subchapter III (including a violation which has occurred, is occurring, or is about to occur) may file a complaint" under the "State-based administrative complaint procedures."[9]  *Id.* § 21112(a)(1), (a)(2)(B).  Texas has established its HAVA administrative-complaint structure in accordance with § 21112(a)(2).  *See* 1 Tex. Admin. Code § 81.171.  Nowhere else in HAVA's language is there an express indication of alternative enforcement mechanisms, let alone a private right of action.  Plaintiffs have not offered any evidence to the contrary.  And when an "express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."  *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001).  Simply by its terms, HAVA does not create a private right of action.

The Court is not the first to arrive at this conclusion.  Several courts of appeals have also held that HAVA does not create a private cause of action.  *See Bellitto v. Snipes*, 935 F.3d 1192, 1202 (11th Cir. 2019) ("Congress established only two HAVA enforcement mechanisms . . . ."); *Am. Civ. Rts. Union v. Phila. City Comm'rs*, 872 F.3d 175, 184–85 (3d Cir. 2017) ("[T]he HAVA does not include a private right of enforcement.  By its text, . . . HAVA only allows enforcement via attorney general suits or administrative complaint."); *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 572 (6th Cir. 2004) ("HAVA does not itself create a private right of

---

[9] Worth noting, this enforcement power is inapplicable to remedy the HAVA violations alleged here.  Under the state-based administrative complaint procedures, the only requirement as to which private complaints of alleged HAVA violations these state systems must entertain are those regarding provisions of subchapter III, which relate to "Uniform and Nondiscriminatory Election Technology and Administration Requirements."  *See* 52 U.S.C. §§ 21081–21102. These statutory provisions do not directly involve funding concerns under HAVA's scheme.

action.").  The Fifth Circuit found the same in an unpublished opinion.  *See Morales-Garza v.*
*Lorenzo-Giguere*, 277 F. App'x 444, 446 (5th Cir. 2008).  Moreover, the Supreme Court has even
held that private litigants are "not sufficiently likely to prevail on the question [as to] whether
Congress has authorized" district courts to enforce HAVA when the plaintiffs are private litigants.
*Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (per curiam).  Taking these authorities
together, it is clear that HAVA does not expressly confer a private cause of action for enforcement
purposes.

Plaintiffs argue, alternatively, that even if HAVA does not explicitly afford them a private
right of action, HAVA's scheme itself implies the availability of such private enforcement
mechanism.  Plaintiffs contend that Texas's administrative-complaint system under HAVA is
"legally insufficient" and therefore gives rise to a private cause of action (Dkt. #1 at p. 6).

This argument fails for two reasons.  First, nowhere in their pleadings—and at no time in
the October 16th hearing—did Plaintiffs offer anything more than bare conclusory statements that
Texas's procedures are out of compliance with HAVA's statutory requirements.  Plaintiffs
correctly read § 21112 to condition Texas's receipt of HAVA funds on the establishment and
maintenance of § 21112(a)(2)-compliant "State-based administrative complaint procedures."  52
U.S.C. § 21112(a)(1).  But Plaintiffs provide no evidence to support their argument that 1 TEX.
ADMIN. CODE § 81.171 strays from § 21112(a)(2)'s requirements.  In fact, they "offer no reason
to think so" (Dkt. #19 at p. 19).  Without more, Plaintiffs' assertion lacks persuasive force.

Second, Plaintiffs do not satisfy the test articulated in *Alexander v. Sandoval* to prove the
existence of an implied cause of action under HAVA.  *See* 532 U.S. at 275.  In *Sandoval*, the
Supreme Court reiterated that "[l]ike substantive federal law itself, private rights of action to
enforce federal law must be created by Congress."  *Id.* at 286 (citing *Touche Ross & Co. v.*

20

*Redington*, 442 U.S. 560, 578 (1979)).  When evaluating laws in an effort to locate implied causes of action, federal courts are tasked with "interpret[ing] the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id.* (citing *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 15 (1979)).  Statutory intent is "determinative" as to the creation of a private remedy by Congress.  *Id.*  Implied private rights of action exist only when a private right *and* private remedy are ascertainable from the statutory text and intent—the Supreme Court has accordingly "admonished that 'raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals.'"  *Salazar v. S. San Antonio Indep. Sch. Dist.*, 953 F.3d 273, 279–80 (5th Cir. 2017) (brackets omitted) (quoting *Sandoval*, 532 U.S. at 287).

Applying these principles to the present case, the Court cannot discern the implied cause of action Plaintiffs allege exists.  The Counties offer the argument that proves fatal to Plaintiffs' assertion here—that "Plaintiffs' approach inverts *Sandoval*'s instructions" (Dkt. #19 at p. 20).  As previously recounted, HAVA creates two explicit methods of enforcement.  Neither enforcement method affords statutory standing to a private litigant in federal court.  Plaintiffs conclude, therefore, that HAVA must confer a private right of action in the absence of further statutory instruction.  But the reality is quite the opposite.  It is canonical that "Congress's creation of specific means of enforcing [a] statute indicates that it did *not* intend to allow an additional remedy—a private right of action—that it did not expressly mention at all."  *Stokes v. Sw. Airlines*, 887 F.3d 199, 203 (5th Cir. 2018) (internal quotation marks omitted) (quoting *Boswell v. Skywest Airlines, Inc.*, 361 F.3d 1263, 1270 (10th Cir. 2004)).  Considering the specificity with which Congress detailed HAVA's enforcement subchapter, it is difficult to see how any evidence Plaintiffs have offered serves to counteract *Sandoval*'s principle that "express provision of one

method of enforcing a substantive rule suggests that Congress intended to preclude others." *Sandoval*, 532 U.S. at 290; *see* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 108 (2012) (explaining that the "more specific the enumeration, the greater" the likelihood that anything excluded was not intended to be included).

Even if the Court entertained the notion of crafting policy and believed that a private cause of action under HAVA should exist, the Court could not create one, "no matter how desirable that might be as a policy matter, or how compatible with the statute." *Sandoval*, 532 U.S. at 287.  To do so would risk "arrogating legislative power" and would cast aside the structural integrity of the federal government's separation of powers.  *Hernandez v. Mesa*, 140 S. Ct. 735, 741 (2020).  It is within Congress's purview to say what the law should be.  As written and duly enacted, HAVA does not explicitly or implicitly create a private cause of action.

### ii.  Constitutional Claims

Plaintiffs also allege separate causes of action originating in the Supremacy Clause and the Elections Clause.  The Supremacy Clause provides that:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. CONST. art. VI, cl. 2.  And the Elections Clause reads:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

U.S. CONST. art. I, § 4, cl. 1.  Since neither constitutional provision explicitly provides a cause of action for private litigants, Plaintiffs are necessarily referencing the potential existence of implied causes of action under these clauses.

Even though courts have previously followed the Supreme Court in providing the necessary remedies to effectuate the purposes of various constitutional provisions, *see Hernandez*, 140 S. Ct. at 741, this "'*ancien regime*' that freely implied rights of action . . . ended long ago." *Oliva v. Nivar*, 973 F.3d 438, 442 (5th Cir. 2020); *see Canada v. United States*, 950 F.3d 299, 306 (5th Cir. 2020) (noting that the Supreme Court has not found any other constitutionally implied remedy in four decades).  This pronounced shift occurred over time as further considerations of federalism and the dual-sovereignty structure demonstrated that "Congress is 'better positioned' than the judiciary 'to consider if the public interest would be served by imposing a new substantive legal liability.'"  *Serrano v. Customs & Border Patrol*, No. 18-50977, 2020 WL 5539130, at *10 (5th Cir. Sept. 16, 2020) (per curiam) (brackets omitted) (quoting *Ziglar*, 137 S. Ct. at 1857).  So "[w]hen a party seeks to assert an implied cause of action under the Constitution itself, just as when a party seeks to assert an implied cause of action under a federal statute, separation-of-powers principles are or should be central to the analysis." *Ziglar*, 137 S. Ct. at 1857.

Supreme Court precedent directly precludes Plaintiffs' Election Clause claim.  As discussed briefly above, *see supra* Section I.A, the plaintiffs alleging an Elections Clause violation in *Lance v. Coffman* were unable to bring suit in their capacity as private citizens.  *See* 549 U.S. at 442.  Even though standing and subject matter jurisdiction are related (but distinct) concepts, the holding in *Coffman* signifies that private litigants cannot derive a cause of action directly from the constitutional text of the Elections Clause.  This makes logical sense.  The Elections Clause outlines a structural principle of the American system of federalism, dividing power concurrently between the states and Congress.  U.S. CONST. art. I, § 4, cl. 1.  The Clause does not speak to individual rights.  Any rights and corresponding remedies for Elections Clause violations must therefore arise from laws enacted by Congress pursuant to its authority under the Elections Clause.

Simply put, no cause of action based solely on the text of the Elections Clause exists for Plaintiffs to plead.

The Court next turns to Plaintiffs' Supremacy Clause argument.   In *Armstrong v. Exceptional Child Center, Inc.*, the Supreme Court wholly rejected the theory that a private cause of action arises out of the Supremacy Clause.  *See* 575 U.S. 320, 324–27 (2015).  Writing for the Court, Justice Scalia explained that "the Supremacy Clause is not the 'source of any federal rights,' and certainly does not create a cause of action."  *Id.* at 324–25 (citation omitted).  The Clause is "a rule of decision: 'It instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal laws in court, and in what circumstances they may do so.'"  *Green Valley Special Util. Dist. v. City of Schertz, Tex.*, 969 F.3d 460, 498 (5th Cir. 2020) (en banc) (Oldham, J., concurring) (quoting *Armstrong*, 575 U.S. at 325).  With such emphatic and sweeping language, *Armstrong*'s "reasoning that a private actor cannot sue in court to enforce federal law pursuant to the Supremacy Clause" appears broadly applicable.  *See Jefferson Cmty. Health Care Ctrs, Inc. v. Jefferson Par. Gov't*, No. CV 16-12910, 2016 WL 3997025, at *13 (E.D. La. July 26, 2016), *rev'd in part on other grounds*, 849 F.3d 615 (5th Cir. 2017).

Plaintiffs maintain the validity of their Supremacy Clause claim by citing to *League of Women Voters v. Blackwell*, a case out of the U.S. District Court for the Northern District of Ohio, in both their pleadings and at the October 16th hearing.  In *Blackwell*, the district court held that "[i]t is clearly established that the Supremacy Clause grants the federal courts jurisdiction over such claims; conflict with a federal law raises a federal question pursuant to 28 U.S.C. § 1331."  *League of Women Voters v. Blackwell*, 340 F. Supp. 2d 823, 827 (N.D. Ohio 2004).

Although their argument is far from clear, Plaintiffs appear to invoke the strand of caselaw that "permits private parties to sue without express statutory authorization to prevent state officials

24

from enforcing state laws on the ground that they are preempted by a federal statute." RICHARD H. FALLON, JR. ET AL., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 745 (7th ed. 2015). This underlying principle traditionally applies when a plaintiff seeks injunctive or declaratory relief from state regulation "on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983); *see Lawrence Cnty. v. Lead-Deadwood Sch. Dist. No. 40-1*, 469 U.S. 256, 259–60, 259 n.6 (1985) (extending *Shaw*'s reasoning to cases involving broader subject matter). Nevertheless, this argument is strained and ultimately unpersuasive in two ways.

First, Plaintiffs support their case with a single decision from a district court outside of the Fifth Circuit. This district court case has also all but assuredly been overruled in relevant part. *Armstrong* was decided by the Supreme Court eleven years after the U.S. District Court for the Northern District of Ohio decided *Blackwell*. *Armstrong* clarified that "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers" does not "rest[] upon an implied right of action contained in the Supremacy Clause." 575 U.S. at 327. The clear applicability of *Armstrong* to refute Plaintiffs' position is obvious.[10]

Second, the cause of action Plaintiffs bring under the Supremacy Clause is misapplied to the instant suit in several ways. For one thing, these suits are brought against federal and state *officers*, not federal or state governments.[11] The Counties are not state officers. Additionally, this

---

[10] The Court is bound by Supreme Court precedent as an inferior federal court, and *Blackwell* does not bind the Court because it was decided by a coordinate Article III court outside of the Court's jurisdictional hierarchy. *See* TRACEY E. GEORGE & SUZANNA SHERRY, WHAT EVERY LAW STUDENT REALLY NEEDS TO KNOW: AN INTRODUCTION TO THE STUDY OF LAW 94 fig. (2d ed. 2016).

[11] Even though "*Armstrong* d[id] not modify *Shaw*'s clear language," *Air Evac EMS, Inc. v. Tex., Dep't of Ins.*, 851 F.3d 507, 515 (5th Cir. 2017), 28 U.S.C. § 1331 provides federal courts with jurisdiction over preemption claims "so long as the [plaintiff] can satisfy *Ex parte Young*'s equitable exception." *City of Austin v. Abbott*, 385 F. Supp. 3d 537, 543 (W.D. Tex. 2019). This exception allows plaintiffs to bring suits for injunctive or declaratory relief "against

type of lawsuit seeks to prevent state officials from enforcing state laws on preemption grounds. Plaintiffs request relief from the Court based on a theory that does not clearly identify any state official, let alone a specific state law that this unidentified state official might enforce that would be preempted by federal law.  Furthermore, even if Plaintiffs had offered this same claim but under the theory that this "ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity" rather than the Supremacy Clause, *Armstrong*, 575 U.S. at 327, Plaintiffs' argument would still be misplaced.  The problem detailed above in applying the principle from *Shaw* to the present suit would also plague this theory—the defendants are *not* state officials.  *See Carroll v. Safford*, 44 U.S. (3 How.) 441, 463 (1845) ("[R]elief may be given in a court of equity . . . to prevent an injurious act by a *public officer*." (emphasis added)).[12]  In sum, Plaintiffs' arguments do not pass muster.

The Court concludes that separate causes of action are unavailable to Plaintiffs under HAVA, the Elections Clause, and the Supremacy Clause.  Thus, the likelihood of their claims succeeding on the merits is remote.  But even if Plaintiffs had standing in this case and had pleaded viable claims, the only cause of action that would remain falls under HAVA preemption.  The Court turns now to the merits of this claim.

### b.  Preemption

Almost every page of Plaintiffs' Complaint argues that federal law preempts state law and therefore the Counties' actions are illegal.  While the preemption doctrine is far from straightforward and remains the subject of significant debate, the theory Plaintiffs proffer

---

a state official acting in violation of federal law if there is a 'sufficient connection to enforcing an allegedly unconstitutional law.'"  *Tex. Democratic Party v. Abbott*, No. 20-50407, 2020 WL 5422917, at *5 (5th Cir. Sept. 10, 2020) (quoting *In re Abbott*, 956 F.3d 696, 708 (5th Cir. 2020)).  No state officials are defendants in this action.

[12] And even if this theory of recovery was not dead on arrival, the Court would only have subject matter jurisdiction over the equitable claims and not those for declaratory relief because "the Declaratory Judgment Act is insufficient to confer federal question jurisdiction under 28 U.S.C. § 1331."  *Frye v. Anadarko Petroleum Corp.*, 953 F.3d 285, 293 (5th Cir. 2019) (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950)).

misconstrues how the preemption doctrine functions.  To give proper context to the analysis of Plaintiffs' preemption claims, the Court first attempts to partially untangle the doctrinal web of preemption.

The Court initially seeks to address a critical misconception regarding preemption.  Many understand preemption as derivative of the Supremacy Clause.  *See, e.g.*, *Preemption*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining preemption as "[t]he principle (*derived from the Supremacy Clause*) that a federal law can supersede or supplant any inconsistent state law or regulation" (emphasis added)).  The conceptual overlap between preemption and the Supremacy Clause is evident considering that "[s]tatements of preemption law almost routinely 'start from the top' with a reference to the Supremacy Clause." Stephen A. Gardbaum, *The Nature of Preemption*, 79 CORNELL L. REV. 767, 769 (1994).  But upon closer examination, it becomes clear that constitutional provisions other than the Supremacy Clause may control preemption analysis in specific, limited situations.

It is first worth noting that the Supremacy Clause does not directly confer rights to individuals or powers to Congress—it is simply "a rule of priority." *Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1901 (2019) (plurality opinion).  This does not, however, "diminish the significant role that courts play in assuring the supremacy of federal law." *Armstrong*, 575 U.S. at 326.  The Supremacy Clause is the structural fulcrum upon which the American system of federalism balances—the Clause "protects structural rights . . . by 'establish[ing] a structure of government which defines the relative powers of states and the federal government.'" *City of Alpine v. Abbot*, 730 F. Supp. 2d 630, 633 (W.D. Tex. 2010) (quoting *San Diego Unified Port Dist. v. Gianturco*, 457 F. Supp. 283, 290 (S.D. Cal. 1978), *aff'd*, 651 F.2d 1306 (9th Cir. 1981)).  It is the duty of federal courts to preserve this fundamental balance of powers.  *See Texas v. White*, 74 U.S. (7

Wall.) 700, 725 (1868) ("The Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States."), *overruled in part by Morgan v. United States*, 113 U.S. 476 (1885).

But federal courts cannot fulfill this role in sustaining the "delicate balance" of federalism absent valid congressional action, for "Congress may impose its will on the States" so "long as it is *acting within the powers granted it under the Constitution*." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (emphasis added); *see Murphy v. NCAA*, 138 S. Ct. 1461, 1476 (2018) ("The legislative powers granted to Congress are sizable, but they are not unlimited."). "Every law enacted by Congress must be based on one or more of its powers enumerated in the Constitution," *United States v. Morrison*, 529 U.S. 598, 607 (2000), and the Constitution exists in crucial part so this principle "may not be mistaken[] or forgotten," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176 (1803). Taken together, these legal principles stand for the proposition that federal courts may decide a case or controversy regarding the supremacy of conflicting federal and state law only if Congress enacted the federal law under an enumerated constitutional provision.

The first step in determining whether Congress lawfully preempted state law is identifying the enumerated power under which Congress claims to have acted, then followed by locating the relevant constitutional authority that delineates the proper roles within the federalist structure that the states and Congress are to play. *See, e.g.*, *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 343–52 (1819). The first aspect is almost always self-evident from the statutory text itself. It is the second element that more directly involves preemption. Once the enumerated power under which Congress acted is ascertained and found to be within the parameters of the Constitution,

federal courts may be called upon to determine whether the federal law conflicts with state law.[13] In most situations, this is where the Supremacy Clause plays its part.  At this juncture, federal courts are obligated to the Clause's command—determine what "the supreme law of the land" is and bind the separate sovereigns accordingly.  *Cooper v. Aaron*, 358 U.S. 1, 18 (1958).  This is the default process federal courts follow in deciding cases involving preemption issues, and a complex body of law has developed over time governing these situations that affect all walks of American life.[14]

The Supremacy Clause is called upon so frequently when federal and state laws conflict because it is the default provision that controls in these situations.  If no other constitutional provision addresses the interplay between federal and state power in respect to a specific area of regulatory authority, the Supremacy Clause fills the gap.  This explains why recitations of law generally characterize the Supremacy Clause and preemption as one and the same.  *E.g.*, *Simmons v. Sabine River Auth. La.*, 732 F.3d 469, 473 (5th Cir. 2013) ("As is well known, federal preemption is based on the Supremacy Clause, which provides that federal law 'shall be the supreme Law of the Land.'" (quoting U.S. CONST. art. VI, cl. 2)).

But this broad rule is not always applicable.  For instance, the Framers of the Constitution addressed certain distributions of power in the constitutional text more than once to affirm the allocation of authority within the federalist structure with precision.  *See, e.g.*, *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 235–37 (1824) (explaining that the Framers were "[n]ot satisfied with the

---

[13] "'The basic question involved in Supremacy Clause cases is never one of interpretation of the Federal Constitution but inevitably one of comparing two statutes' to see if they can be read harmoniously."  *United States v. Zadeh*, 820 F.3d 746, 754 (5th Cir. 2016) (cleaned up) (quoting *Swift & Co. v. Wickham*, 382 U.S. 111, 120 (1965)); *see* Caleb Nelson, *Preemption*, 86 VA. L. REV. 225, 303 (2000) ("The Supremacy Clause requires preemption only when the rules provided by state and federal law contradict each other, so that a court cannot simultaneously follow both." ).

[14]  For instance, a core principle of federal preemption law is that federal law can preempt state law "in three different ways: when Congress does so expressly; when federal law occupies the entire field of regulation; and when state law conflicts with federal law."  *Butler v. Coast Elec. Power Ass'n*, 926 F.3d 190, 195 (5th Cir. 2019).  *See generally* NOAH R. FELDMAN & KATHLEEN M. SULLIVAN, CONSTITUTIONAL LAW 283–86 (20th ed. 2019).

express grant to the United States of the power over commerce" in Article I, Section 8, Clause 3 and accordingly added Article I, Section 10, Clauses 2 and 3 to "negative[] the exercise of [certain commerce] power[s] to the States"). Although few and far between, this type of exception affects preemption inquiries under the Supremacy Clause by adding specific, necessary considerations to the analysis. *Cf. Coastal Conservation Ass'n v. United States Dep't of Commerce*, 846 F.3d 99, 107 (5th Cir. 2017) (invoking the "general/specific canon" of construction). This makes sense because the specific "comes closer to addressing the very problem posed by the case at hand and is thus more deserving of credence." SCALIA & GARNER, *supra*, at 183.

This brings the Court to the Elections Clause. This constitutional provision is *sui generis* as a structural component in the American federalist system. Its doctrinal roots stem from the foundational idea that legitimate governments "deriv[e] their just powers from the consent of the governed." THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776). Determining exactly who the governed consent to be governed by takes place in elections through the individual right to vote. *See Burdick v. Takushi*, 504 U.S. 428, 433 (1992) ("It is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure.'" (quoting *Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979))).

Recognizing how imperative an operable election system is in a free society, the Framers included a provision in the Constitution specifically addressing the division of regulatory authority over federal elections—the Elections Clause.[15]   *See* THE FEDERALIST NO. 57, at 348 (James Madison) (Clinton Rossiter ed., 1961) ("The elective mode of obtaining rulers is the characteristic policy of republican government."). The Clause has two functions:  it first imposes a duty on the

---

[15] *See Rucho v. Common Cause*, 139 S. Ct. 2484, 2495–96 (2019) (detailing relevant history of the debate and passage of the Elections Clause); *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 7–9 (2013) (same).

states "to prescribe the time, place, and manner of electing Representatives and Senators," and then confers upon Congress "the power to alter those regulations or supplant them altogether." *Inter Tribal Council*, 570 U.S. at 8.  Phrased differently, the Elections Clause "gives states the responsibility for establishing the time, place, and manner of holding congressional elections, *unless Congress acts to preempt state choices*."  *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000) (emphasis added).

The plain language of the Elections Clause leaves no doubt as to the Framers' desired mechanism for resolving conflicts of federal and state law regarding the "time, place, and manner" of federal elections.  States are initially entrusted—and duty-bound—to promulgate laws and regulations governing these considerations of federal elections.  And only when "the state system . . . directly conflict[s] with federal election laws on the subject" will state law regulating the "time, place, and manner" of federal elections be uprooted.  *Bomer*, 199 F.3d at 775; *see Ex parte Siebold*, 100 U.S. (10 Otto) 371, 384 (1879) ("When exercised, the action of Congress, so far as it extends and conflicts with the regulations of the State, necessarily supersedes them.").  As such, it is indisputable that the power the Framers imbued Congress with pursuant to the Elections Clause was "none other than the power to pre-empt."  *Inter Tribal Council*, 570 U.S. at 14; *see id.* ("When Congress legislates with respect to the 'Times, Places and Manner' of holding congressional elections, it *necessarily* displaces some element of a pre-existing legal regime erected by the States.").

"As should be clear . . . , the Elections Clause operates quite differently from the Supremacy Clause."  *Gonzalez v. Arizona*, 677 F.3d 383, 391 (9th Cir. 2012) (en banc), *aff'd sub nom. Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013).  While the Supremacy Clause "addresses preemption in areas within the states' historic police powers, the Elections Clause

31

affects only an area in which the states have no inherent or reserved power: the regulation of federal elections."  *Id.* at 392 (citing *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 804–05 (1995)); *see Fish v. Kobach*, 840 F.3d 710, 727 (10th Cir. 2016) ("[T]he regulation of congressional elections is not a subject of state police power nor one that is traditionally the province of the states.  Nor could it be, because the states' power over congressional elections—or rather the duty to provide for elections—derives from an express grant in the Constitution.").  In fact, the Supreme Court has never "relied on or even discussed Supremacy Clause principles" in its Elections Clause jurisprudence.[16]  *Id.*

What all this means for the instant case is that the preemption analysis of Plaintiffs' claims must place particular importance on the first step in the determination as to whether Congress lawfully preempted state law:  identifying the enumerated power under which Congress claims to have acted.  If Congress passes legislation under the authority granted by the Elections Clause, then the default preemption analysis under the Supremacy Clause becomes immaterial and the Elections Clause preemption methodology applies.  If Congress enacts law under a different enumerated power, then the traditional Supremacy Clause-based preemption analysis applies.

Plaintiffs bring their preemption claim under HAVA.  Congress explicitly enacted HAVA under its Elections Clause authority.  H.R. Rep. 107–329, pt. 1, at 57, 2001 WL 1579545, at *57. Therefore, the more specific preemption analysis under Elections Clause jurisprudence applies. The general preemption framework traditionally associated with the Supremacy Clause is thus irrelevant to the Court's analysis.

---

[16] Plaintiffs support their preemption argument by stating that the plain statement rule and the presumption against preemption are inapplicable in the Elections Clause context (Dkt. #26 at p. 9:7-19). While this is an accurate statement of law, *see, e.g.*, *Fish*, 840 F.3d at 726–32, the Court cannot make out how it strengthens Plaintiffs' argument.

### i. Elections Clause

Having determined that the preemption analysis under the Elections Clause is appropriate here, the Court briefly restates the applicable framework. *See, e.g.*, *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 729–31 (S.D. Miss. 2014). The Elections Clause itself is a "default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997) (citation omitted). The substantive scope of the Elections Clause is vast—the Supreme Court has found the "time, place, and manner" of federal elections to be "comprehensive words" that "provide a complete code for congressional elections" in order "to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). When there is no federal law that directly conflicts with state law regulating the time, place, and manner of federal elections, then state law controls by default. *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 399 (5th Cir. 2013). If a federal law enacted under Congress's Elections Clause power directly conflicts with state law regulating the same, then the federal law controls and the analysis concludes. *Id.*; *see Inter Tribal Council*, 570 U.S. at 15 ("[T]here is no compelling reason not to read Elections Clause legislation simply to mean what it says.").

Plaintiffs' preemption argument does not comport with the applicable analytical framework for the Elections Clause preemption. The Court asked Plaintiffs' counsel at the October 16th hearing to identify the specific provisions of HAVA that preempted the alleged ultra vires actions of the Counties. Counsel, in effect, replied that the entirety of HAVA's statutory scheme preempted the Counties' actions (Dkt. #26 at p. 16:7–13). Plaintiffs appear to argue that because Congress decided to exercise its regulatory authority in a specific area pursuant to an

33

enumerated constitutional provision, any laws or *even actions* not expressly provided for by HAVA are unconstitutional.  This rationale is misguided.

To begin, Plaintiffs' theory of preemption is misconceived under *any* variation of federal preemption doctrine.  Even if the broader analysis under the Supremacy Clause was applicable, this principle of preemption would be foreign.  The rationale Plaintiffs articulate here is likely an attempt to invoke the concept of field preemption—an arm of general preemption analysis under the Supremacy Clause.  "Field preemption occurs when 'States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance.'"  *City of El Cenizo v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018) (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)); *see Va. Uranium, Inc.*, 139 S. Ct. at 1905–06.  The way field preemption actually works is not only inapposite to Elections Clause preemption, but it almost entirely upends the Election Clause's meaning as handed down by the Framers.  If anything, the concept from general preemption analysis that most aptly translates to the Elections Clause context is conflict preemption, which "exists where 'compliance with both state and federal law is impossible,' or where 'the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015) (quoting *California v. ARC America Corp.*, 490 U.S. 93, 100, 101 (1989)).  Conflict preemption, however, does not capture the nature of the Elections Clause preemption analysis.  Factors irrelevant to Elections Clause legislation must be accounted for where the possibility of conflict preemption persists.  *See, e.g.*, *Elam v. Kansas City S. Ry. Co.*, 635 F.3d 796, 803–04 (5th Cir. 2011); *see also Inter Tribal Council*, 570 U.S. at 13–14 (explaining why conventional considerations of Supremacy Clause-based preemption are inapplicable in the

Elections Clause context).  In short, Plaintiffs' conception of preemption is found nowhere in federal law and is certainly not applicable to the case currently before the Court.

Moreover, when prompted by the Court at the October 16th hearing to single out which HAVA provision preempted the Counties from accepting the CTCL funds, Plaintiffs identified a specific provision in the statutory scheme—52 U.S.C. § 20901 (Dkt. #26 at p. 16:10–11).  The statutory text of § 20901 does not state that it serves as the exclusive source of funding for federal election administration, and Plaintiffs do not carry their burden in demonstrating the validity of their interpretation.  Further, Plaintiffs fail to identify the Texas law that directly conflicts with § 20901.[17]  Because the Court's role is to adjudicate the case on its merits and not to present the merits themselves, the Court is unable to conduct a proper preemption analysis.

### B.  Likelihood of Irreparable Harm

The Court next considers whether Plaintiffs can demonstrate a likelihood of irreparable harm.  Plaintiffs allege that irreparable harm will consequently result because CTCL grants will lead to more progressive votes cast and more progressive candidates elected.  The Court concludes, however, that Plaintiffs cannot show irreparable harm for the same reasons they do not have standing.

For a preliminary injunction, Plaintiffs must demonstrate that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).  An injunction is only appropriate if the anticipated injury is imminent and not speculative.  *Id.* at 22.

---

[17] In fact, at least one Texas law explicitly *allows* counties to receive money or other assets "for the purpose of performing a function conferred by law on the county or a county officer."  TEX. LOC. GOV'T CODE ANN. § 81.032.

Plaintiffs' "harm" relies on a speculative chain of inferences contradicted by the facts presented before the Court.  CTCL grants are nonpartisan and guaranteed to any municipality that meets minimum criteria.  In practice, 88% of Texas counties that received grants voted for the Republican presidential candidate in 2016.  Despite these uncontroverted facts, Plaintiffs argue bias because large metropolitan areas received proportionally larger grants.  CTCL grants are, however, based on nonpartisan criteria—like population—and are used for nonpartisan administrative purposes—like PPE for poll workers.  More populous counties necessarily require more funds for administrative purposes because they have more registered voters.  The applicants, not the CTCL, identify their financial needs.  Any correlation between grant size and vote outcome is therefore coincidental, not causal.

Even if CTCL grants were partisan, Plaintiffs' theory assumes the grants will change the electoral outcome.  Given the near-infinite variables affecting a federal election, that is "wholly speculative."  *See Siegel v. LePore*, 234 F.3d 1163, 1177 (11th Cir. 2000) (refusing to grant a preliminary injunction where plaintiff's alleged harm was too speculative because it hinged on an electoral outcome); *SAM Party v. Kosinski*, 2020 WL 5359640, at *13 (S.D.N.Y. Sept. 1, 2020) (calling such harm "far from certain").  Ultimately, Plaintiffs' complain that people with different political views will lawfully exercise their fundamental right to vote.  That is not a harm.  That is democracy.

Second, Plaintiffs allege harm because only some Texas counties received grants and not all.  They rely on *Red Clay*, in which the Delaware Chancery Court held that a government can violate the Delaware Election Clause if "it skews the outcome of an election by encouraging or facilitating voting by favored demographic groups."  *Red Clay*, 122 A.3d at 858.  However, *Red Clay* is distinguishable because it interprets the Delaware Constitution, not federal.  *See id.*

36

Additionally, in *Red Clay*, the issue was a school district strategically encouraging parents to vote and discouraging elderly voters from participation in a school board election.  *See id.*  Here, the CTCL grants encourage every voter to participate, not solely the ones with which Plaintiffs agree. This widespread encouragement furthers CTCL's intended purpose to facilitate a safe and efficient voting experience in a pandemic.  CTCL does not favor or disfavor any demographic group of voters; every single county in Texas could have applied and received a minimum of $5,000. Indeed, 117 counties did just that.  As such, Plaintiffs do not claim any irreparable harm.

Third, Plaintiffs allege harm because the counties are acting illegally.  As discussed with reference to success on the merits, the Counties' actions are legal.  Even assuming the Counties acted illegally, generalized grievances are insufficient to establish irreparable harm.  *Lance*, 549 U.S. at 439.  When "[t]he only injury plaintiffs allege is that the law . . . has not been followed," that "is precisely the kind of undifferentiated grievance about the conduct of government that [federal courts] have refused to countenance."  *Id.* at 442.

Fourth, Plaintiffs allege harm because if the grants are illegal, and if there is a close election, then the losing candidate could potentially contest the result of the election.  That assertion includes many "what ifs."  It is so speculative that Plaintiffs could only characterize this series of unfortunate events as "possible" (Dkt. #26 at p. 17:6).  "Possible" is not a "substantial threat of irreparable harm.  *See Lakey*, 667 F.3d at 574.

Other Courts reach the same conclusion that this Court does today.  Plaintiffs have filed nearly identical lawsuits in at least six other jurisdictions. *Minn. Voters All. v. City of Minneapolis*, No. 20-cv-2049 (D. Minn. Sept 24, 2020); *Wis. Voters All. v. City of Racine*, No. 20-cv-1487 (E.D. Wis. Sept. 24, 2020); *Pa. Voters All. v. Centre Cnty.*, No. 4:20-cv-1761 (M.D. Pa. Sept. 25, 2020); *Election Integrity Fund v. City of Lansing*, No. 20-cv-950 (W.D. Mich. Sept. 29, 2020); *Iowa Voter*

*All. v. Black Hawk Cnty.*, No. 6:20-cv-2078 (N.D. Iowa Oct. 1, 2020); *Ga. Voter All. v. Fulton Cnty.*, No. 1:20-cv-4198 (N.D. Ga. Oct. 9, 2020).   Of those six, three issued orders denying Plaintiffs' requested relief.   *See* Order Den. Mot. for Prelim. Relief, *Wis. Voters All.*, (E.D. Wis. Oct. 14, 2020), ECF No. 27; Order Den. Mot. for TRO and Establishing Br. Schedule, *Election Integrity Fund* (W.D. Mich. Oct. 2, 2020), ECF No. 19; Mem. of Law & Order, *Minnesota Voters Alliance*, (D. Minn. Oct. 16, 2020), ECF No. 25.   The U.S. District Court for the Western District of Michigan held that "Plaintiffs have failed to show irreparable harm" because they "allege that they will be harmed on November 3, 2020 if their chosen candidates do not prevail, but they do not allege that there is any ongoing use of the grants that causes them immediate, irreparable harm. Order Den. Mot. for TRO and Establishing Br. Schedule, *Election Integrity Fund* (W.D. Mich. Oct. 2, 2020), ECF No. 19, at *2.   The U.S. District Court for the District of Minnesota found plaintiffs lacked standing because "bare claims that the City has violated various laws are insufficient" to establish injury.   Mem. of Law & Order, *Minn. Voters All.*, (D. Minn. Oct. 16, 2020), ECF No. 25, at *11.

Notably, one harm is *not* alleged.   At no point do Plaintiffs allege that the Counties' actions have made it harder for them to exercise their right to vote.   The truth is that Plaintiffs—like all residents of the Counties—stand to benefit from the additional resources for safe and efficient voting provided by CTCL grants.   A "law that makes it easier for others to vote does not abridge any person's right to vote." *Texas Democratic Party*, 2020 WL 5422917, at *15.   The CTCL grants provide funds for PPE; recruiting, training, and retaining poll workers; and socially distant voting alternatives.   These measures make it easier for Texans to lawfully vote.   As noted above, "[h]ow this expansion of voting opportunities burdens anyone's right to vote is a mystery." *Hughs*, 2020 WL 6023310, at *5.

### C.  Substantial Injury Outweighs Harm

When determining whether to grant a preliminary injunction, the Court must determine whether Plaintiffs' threatened injuries outweigh any damage the injunction may cause the Counties.  *See Winter*, 555 U.S. at 20.  Within that consideration is the notion that plaintiffs "who unreasonably delay" their suit may be denied equitable relief.  *Parker v. Dacres*, 130 U.S. 43, 50 (1889).

Plaintiffs filed at least six near-identical lawsuits around the country challenging CTCL grants.  *See* supra Section II.B.  Plaintiffs did not sue the Counties at the same time, however. Despite the Counties publicly accepting the grants in September, Plaintiffs did not sue until Friday, October 9th—the last business day before early voting began in Texas.  This delay was unreasonable.  It was foreseeable that Counties would immediately spend these funds in early voting efforts.  By the time Plaintiffs sued, Counties already spent or irrevocably committed most of the grant funds.  Although Plaintiffs' delay was objectively brief, it potentially had a prejudicial effect on the Counties given the urgency of the ongoing election.

Plaintiffs argue that an injunction would preserve the "status quo" by merely preventing Counties from spending remaining funds.  The status quo, however, includes the Counties providing residents with public health protections to ensure safe voting.  An injunction at this late stage, when millions of votes have already been cast, would send the Counties scrambling to adjust while voting occurs.  *See Oden v. Brittain*, 396 U.S. 1210, 1211 (1969) (Black, J., opinion in chambers); *see also Veasey v. Perry*, 769 F.3d 890, 895 (5th Cir. 2014).

Finally, Plaintiffs assert a novel argument that if the Court finds a likelihood of success on the merits, then the Court must necessarily find that the balance of equities weighs in Plaintiffs' favor.  Of course, if this were true, then there would be no need for the remaining preliminary

injunction criteria.  Courts would reflexively issue preliminary injunctions after determining a likelihood of success and, necessarily, would never weigh the equities.  But that is not the law; Plaintiffs must meet each criteria of a preliminary injunction—including irreparable harm, balance of hardships, and the public's interest.  *See Lakey*, 667 F.3d at 574.  They do not.

### D.  Potential Disservice of the Public Interest

The Court has determined that Plaintiffs' harm is speculative and generalized.  On the other hand, the public faces a real danger of unsafe and inefficient elections.  The grants facilitate safe, secure, and efficient voting for all residents during the pandemic.   Irrespective of political affiliation, every single voter will benefit by having appropriate precautions to ensure safe voting.

Texas has an "important regulatory interest" in administering its elections.  *Hughs*, 2020 WL 6023310, at *7.  "When a district court's injunction prevents a State from effectuating its own election procedures, put in place by elected officials, it suffers irreparable harm."  *Id.* at *9.  The Counties have already spent or pledged most of the funds for nonpartisan administrative expenses. Enjoining the Counties would disrupt these ongoing, pressing efforts to ensure each voter has the right to safely and effectively exercise their right to vote.

Perhaps most importantly, the sanctity of elections must be protected.  The Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election."  *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020).  To do so risks "voter confusion and consequent incentive to remain away from the polls."  *Purcell v. Gonzalez*, 549 U.S. 1, 127 (2006) (per curiam).

We are not on the eve of the election—voting is underway.  *See Mi Familia Vota v. Abbott*, No. 20-50793, 2020 WL 6058290, at *7 (5th Cir. Oct. 14, 2020) (refusing election-related injunctive relief because "it would be inappropriate for the district court to grant much of the

40

requested relief with the election ongoing."). Millions of early votes have been cast. Millions more face disruption if the Court issues the requested injunction. Plaintiffs' counsel argues that "federal courts have a role in protecting the integrity of federal elections" (Dkt. #26 at p. 41:8-10). The Court agrees. And for that exact reason, the Court will not legislate on Plaintiffs' behalf. Texans deserve confidence in their electoral process. *See First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 788–89 (1978); *see also Tex. Democratic Party v. Abbott*, 961 F.3d 389, 413 n.1 (5th Cir. 2020). That confidence comes from their elected officials making policy decisions, not from courts creating policy. The Counties have made the policy decision to use nonpartisan funds to protect residents during an unprecedented public health crisis. The Court will not interrupt the Counties' decision-making process to wade into legislative waters it should undeniably avoid.

## CONCLUSION

Plaintiffs miss the mark on all three elements of standing. Plaintiffs likewise cannot meet any of the elements required to grant a preliminary injunction. No private cause of action exists under HAVA or the relevant sections of the United States Constitution. HAVA does not preempt the Counties from accepting and using the CTCL grant under the Elections Clause. Plaintiffs have failed to meet the harm standard for standing, and the Court concludes that for the same reasons, the irreparable harm standard is not met under the preliminary injunction analysis. The substantial injury to Plaintiffs, which the Court notes does not exist, does not outweigh the harm to the Counties that would result from issuing an injunction. Finally, issuing an injunction in this case would disserve the public interest.

It is therefore **ORDERED** that Plaintiffs' Motion for Temporary Restraining Order (Dkt. #2) is hereby **DENIED**.

**SIGNED this 20th day of October, 2020.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE